## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

TRANSPORTATION MANAGEMENT    *
SERVICE, INC.,
46 S. Market Street, 2nd Floor    *
Frederick, MD 21701
   *
     Plaintiff,    *
   *
     v.    *
   *
ANDREW RIPANI    *
17135 E. Neu Towne Pkwy.
Parker, CO 80134    *
     and    *        Case No._____
   *
CHARTER UP
3340 Peachtree Rd. NE, Suite 100    *
Atlanta, GA 30326
Serve On:    *
Registered Agent: Armir Mehmeti
3340 Peachtree Rd. NE, Suite 100    *
Atlanta, GA 30326
   *
     Defendants.    *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## VERIFIED COMPLAINT
## FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND OTHER RELIEF

Plaintiff Transportation Management Services, Inc. ("TMS"), by and through its undersigned counsel, hereby file this Complaint against Charter Up, LLC ("Charter Up") and Andrew Ripani ("Ripani") (jointly referred to herein as "Defendants"), alleging as follows:

### NATURE OF THE ACTION

1.       This is an action by TMS for preliminary and permanent injunctive relief, as well as compensatory, consequential, and punitive damages and legal fees associated with Ripani's

unlawful access to TMS's computer systems, resulting in his and Charter Up's misappropriation of TMS's proprietary and confidential business information and trade secrets in order to unfairly compete against TMS in the events-related transportation and parking industry.

2.      Defendants' unlawful competitive efforts constitute violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1839, *et seq*.; the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(4); the Maryland Uniform Trade Secrets Act, Commercial Law Article § 11-1201, *et seq*; and the common law of the State of Maryland.

3.      TMS will suffer irreparable harm in the event that Ripani and Charter Up are not permanently enjoined from the use and misappropriation of TMS's confidential and proprietary business information and trade secrets.

4.      TMS is a Maryland limited liability company providing events-related transportation and parking services to its clients across the world. TMS conducts its principal management operations in Fredrick, Maryland. TMS provides events-related transportation and parking services throughout the United States, by planning, managing, and providing transportation and parking services for events and coordinating the logistics of the transportation and parking services provided to each client.

5.      Charter Up is a Georgia limited liability company providing events-related transportation and parking services to clients through the United States. Charter Up conducts its principal management operations in Atlanta, Georgia.

6.      Ripani is a former employee of TMS, who held the position of Director of Customer Development and is now a current employee of Charter Up. Ripani resides at 17135 E. Nue Towne Parkway, Parker, Colorado 80134.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction pursuant to 18 U.S.C. §§ 1030(g) and 1836(c).

8.     Venue is proper pursuant to 28 U.S.C. U.S.C. § 1391(b)(2) because a substantial part of the events or omission giving rise to the claims alleged herein arose in this District. Venue is also proper under 28 U.S.C. § 1391(c)(2) because Charter Up is subject to the Court's personal jurisdiction with respect to the civil action in question.

## FACTS COMMON TO ALL COUNTS

### A.  The Business of Transportation Management Services

9.     For the past twenty-nine years, TMS has become a leader in the events-related transportation and parking industry, assisting national and international clients with the planning, coordinating, facilitating and managing of transportation and parking services for large and often high-profile events.

10.     TMS distinguishes itself from other events-related transportation and parking companies through the utilization of data-driven technology that TMS has employed to ensure efficiency, safety, and customer satisfaction for each event.

11.     Over the last twenty-nine years, TMS has expended millions of dollars in research, development, and implementation of unique products, pricing models, marketing strategies, and customer acquisition strategies.

### B.  TMS Policies

12.     TMS maintains an Employee Handbook with policies that govern the conduct of, and expectations for, all TMS employees, which is distributed to each employee at the start of their employment with TMS.

3

13. TMS maintains a "Confidential Company Information" policy in its Employee Handbook, which prohibits the use or disclosure of confidential information and trade secrets, defined as information related to TMS's business, obtained through employment with TMS, including, but not limited to, financial information, new product development, marketing strategies, customer lists, and potential customer leads.

14. TMS also maintains an "Intellectual Property" policy, which prohibits the unauthorized use of TMS's intellectual property, to include but not be limited to, TMS's print materials and software. TMS's confidential company information, trade secrets, and intellectual property as defined in the applicable policies is referred to herein as "TMS Confidential and Proprietary Information."

15. TMS also maintains a policy in its Employee Handbook that governs the termination procedures for all TMS employees (the "Procedures Upon Termination" policy). These procedures require the return of all TMS property including, but not limited to, laptop computers to TMS, as well as the return of all TMS Confidential and Proprietary Information by all employees whose employment with TMS has been terminated.

## C. TMS Safeguards and Protects its Confidential and Proprietary Information

16. In its operations, TMS produces and maintains its Confidential and Proprietary Information that have independent economic value. TMS has taken, and continues to take, appropriate steps to protect the confidentiality of its Confidential and Proprietary Information, including in the following ways:

   a. The policies governing Confidential Company Information, Proprietary Information, and Procedures Upon Termination are maintained in the TMS

Employee Handbook, which is distributed to all TMS employees at the start of employment.

b.   TMS requires all employees to sign acknowledgments of receipt of the TMS Employee Handbook, which includes receipt of the policies stated therein, including the Confidential Company Information, Intellectual Property, and Procedures Upon Termination policies.

c.   Access to Confidential and Proprietary Information is restricted internally to TMS personnel who have a need to know or access to such information, based upon the work they perform for TMS. Such information is not known or disclosed outside of TMS, unless specifically authorized by TMS and subject to controls by TMS's IT department.

d.   Employees are expected to return all company equipment, including laptops and Confidential and Proprietary Information, upon termination of employment.

**D.  *Ripani's Hiring and Scope of Employment with TMS***

17.    Ripani was hired by TMS as the Director of Customer Development on June 22, 2020.

18.    Ripani acknowledged receipt of the TMS Employee Handbook containing TMS's policies on June 30, 2020.

19.    As Director of Customer Development, Ripani's primary job duties included generating, cultivating, and maintaining new business for TMS outside of the convention and tradeshow markets, which included the high-profile entertainment space such as concerts, festivals, and sporting events.

5

20.    During the course of his employment, Ripani had access to Confidential and Proprietary Information related to financing, pricing information, marketing strategies, and customer lists.  Ripani used this information to generate, cultivate, and maintain business for TMS.

### E. Ripani Falsely Claims His Laptop is Inoperable and Requests a New Laptop Under False Pretenses, Less Than Two Months Before Resigning from TMS.

21.    At the time of his hire by TMS, Ripani was provided with a laptop to allow him to work remotely from his home in Parker, Colorado (the "First Ripani Laptop").

22.    On each occasion when Ripani logged into TMS's cloud-based system remotely using the First Ripani Laptop during the course of his employment, the name "ARipani" and an IP address in Colorado were recorded.

23.    On November 8, 2023, Ripani notified IT Manager Christopher Hall via electronic mail that the First Ripani Laptop was inoperable and he requested a new laptop be issued to him. In response, TMS issued Ripani a new laptop (the "Second Ripani Laptop").

24.    Ripani did not return the First Ripani Laptop to TMS at that time, and trusting Ripani's assertion that it was inoperable, TMS did not initially request that the First Ripani Laptop be returned. As noted below, TMS would later learn that Ripani's representation regarding the operability of the First Ripani Laptop was dishonest.

25.    Less than two months later, on January 19, 2024, Ripani submitted his resignation from his employment with TMS.

26.    On February 1, 2024, TMS requested that Ripani return all company-issued equipment, including both the First and Second Ripani laptops, to TMS.

27.    Ripani returned the Second Ripani Laptop as requested, but failed to return the First Ripani Laptop. Again, TMS was not concerned, at that time, with Ripani's failure to return the First Ripani Laptop, because it relied upon Ripani's misrepresentation that the First Ripani Laptop

6

was inoperable. TMS's trust in Ripani's misrepresentations would ultimately prove detrimental to TMS.

28.    Ripani's last day of employment with TMS was February 2, 2024. TMS immediately disabled Ripani's password to TMS's cloud-based system following his last day.

### F.    *Ripani Uses TMS's Confidential and Proprietary Information to Steal TMS's Customers, Resulting in Millions of Dollars of Damages to TMS.*

29.    Throughout the course of his employment, Ripani was assigned to maintain and cultivate certain clients and events, which included the California Nurses Association, Aftershock, Goldensky, and Rolling Loud events.

30.    TMS provided transportation services for the Aftershock event in 2023 and has been a vendor for Aftershock's production company, Danny Wimmer Presents, for more than 9 years, since August 2015. Ripani was assigned the responsibility of coordinating all of TMS's music festival business, which included the Aftershock event and, to prepare competitive proposals for TMS to provide the transportation and parking services for the event each year.

31.    Prior to leaving TMS, one of Ripani's final duties was to provide input for TMS's response to Danny Wimmers Presents' Request for Proposal for the 2025 Aftershock event.

32.    In July, 2024 TMS learned– *for the first time in five years* – that it had not been awarded the Aftershock event, but that the transportation and parking services for the event would be provided by Charter Up.

33.    Upon information and belief, the proposal submitted by Charter Up mirrored the TMS proposal exactly except that the TMS proposal included a management fee that is standard in all TMS proposals, and the Charter Up proposal did not. TMS learned that not only was this management fee the *only* difference between the two proposals but that the management fee in the

TMS proposal (or the lack therefor in the Charter Up proposal) was the deciding factor in Aftershock's decision.

34.     Having learned that Ripani had been hired by Charter Up, and finding the events of the Aftershock proposal and award suspicious, TMS conducted an internal audit of the login attempts by the "ARipani" account. The results of the audit were alarming, to say the least.

35.     The audit revealed that Ripani – through the "ARipani" account – had accessed TMS's cloud-based system on several occasions following the termination of his employment. Upon receipt of this information, TMS immediately disabled Ripani's login information again, just as it had done when his employment ended.

36.     Nonetheless, TMS became suspicious that Ripani was somehow continuing to access TMS's systems and use TMS's Confidential and Proprietary Information, when TMS lost bids to Charter Up for two additional events – Goldensky and Rolling Loud – that it had serviced for several years prior to Ripani's intrusions.

37.     Accordingly, on September 6, 2024, TMS transmitted correspondence to Charter Up, advising the company of Ripani's illegal conduct and demanding that Charter Up cease and desist all efforts to use the stolen information (the "Charter Up Cease and Desist Letter"). A true and correct copy of the Cease and Desist Letter is attached hereto as Exhibit A.

38.     Additionally, on September 17, 2024, TMS transmitted correspondence to Ripani directing him to immediately discontinue ("Ripani Cease and Desist Letter"), including a directive that he discontinues accessing TMS electronic systems. A true and correct copy of the Cease and Desist Letter is attached hereto as Exhibit B.

39.    To confirm whether Ripani was continuing his unauthorized access of TMS's Confidential and Proprietary Information, TMS referred this matter to a third-party forensic auditor, who conducted a second forensic analysis of the "ARipani" account.

40.    TMS has learned, as a result of its ongoing investigation of Ripani's actions, that Ripani has defied TMS's Cease and Desist Letter issued to him to discontinue accessing TMS's electronic systems. *See* the Declaration of Forensic Expert, Kaylin Malutich ("Malutich Decl."), attached as Exhibit C.

41.    In fact, the log entries from the forensic analysis indicate that Ripani continued using the First Ripani Laptop to access TMS's electronic systems, post termination, on at least fifteen (15) occasions – from March 4, 2024 to October 24, 2024 to access TMS's Confidential and Proprietary Information. There is no justification for Ripani's actions with respect to use of TMS's devices or access of TMS's electronic cloud-based systems following the termination of his employment and TMS's Cease and Desist Letter.

42.    Similarly, once TMS put Charter Up on notice that its employee, Ripani, had stolen TMS information and was using that information in the course of his employment with Charter Up, it should have taken action to stop and prevent further unlawful behavior by Ripani. There is no justification for Charter Up allowing its employee to continue to steal and use TMS's Confidential and Proprietary Information during the course of his work for Charter Up.

43.    By hiring and continuing to employ Ripani, Charter Up has gained access to TMS's Confidential and Proprietary Information, including its long-standing client proposals, pricing models, customer lists, and marketing strategies, that will aid its procurement of clients to the detriment of TMS and its competitive advantage in this space.

44.     To date, neither Ripani nor Charter Up has responded to TMS's requests. Accordingly, concerned that Ripani and Charter Up would continue to steal and use its Confidential and Proprietary Information, TMS retained outside counsel and issued follow-up cease and desist requests, as well as preservation of records notices. True and correct copies of the preservation notices issued to Ripani and Charter Up on October 16, 2024, are attached hereto as Exhibits D and E, respectively.

45.     Ripani's theft and misappropriation of TMS's Confidential and Proprietary Information was intentional, knowing, willful and malicious. In other words, Ripani was using the laptop he stole from TMS to strategically raid TMS's Confidential and Proprietary Information for use in his new employment with Charter Up, in violation of the DTSA, the CFAA, and Maryland law.

46.     Charter Up's refusal to stop and prevent Ripani's continued theft of TMS's Confidential and Proprietary Information, as well as Charter Up's decision to continue to use that stolen information during the course of its business, was intentional, knowing, willful, and malicious.

47.     It is the purpose of this action to enjoin Ripani and Charter Up's continued use and possession of TMS's valuable Confidential and Proprietary Information.

48.     Unless the Court intervenes to protect TMS's Confidential and Proprietary Information and to expressly enjoin Ripani from further theft as well as to expressly enjoin Ripani and Charter Up from further possession and use of TMS's Confidential and Proprietary Information, TMS will be irreparably harmed.

49.     TMS has spent millions of dollars in expense, person-hours, trial-and-error, and overhead dedicated to creating and maintaining the aforementioned trade secrets and confidential

information. To allow Ripani and Charter Up to continue their unlawful possession and use of the misappropriated confidential and proprietary information and trade secrets of TMS would allow them to reduce or limit TMS's competitive edge through unlawful activities when it would otherwise take Ripani and Charter Up years and thousands of dollars for the time, labor, and expense to develop and achieve their own equivalent implementation of TMS's business practices.

## COUNT ONE
### Trade Secret Misappropriation Under the Federal Defend Trade Secrets Act, 18 U.S.C. § 1839, *et seq.* (Against All Defendants)

50.    TMS repeats and realleges each and every allegation contained in the prior paragraphs of this Complaint, as if fully set forth at length herein.

51.    The TMS Confidential and Proprietary Information contains confidential and trade secret documents and information, including financial, business and technical information generated by TMS.

52.    The TMS Confidential and Proprietary Information relates to services used in, or intended to be used in interstate or foreign commerce.

53.    TMS has taken reasonable steps to protect the secrecy of the TMS Confidential and Proprietary Information, including the secrecy of the TMS Confidential and Proprietary Information that Ripani retained and/or took from TMS since his employment ended and that he and Charter Up have misappropriated.

54.    Ripani and Charter Up have misappropriated the TMS Confidential and Proprietary Information by (1) acquiring same, knowing and/or having reason to know that the trade secrets were acquired by improper means, including by the theft, misrepresentation, and/or breach of an express and/or implied duty to maintain the secrecy of, and/or (2) using or disclosing the trade secrets after acquiring them through improper means.

55.     Upon information and belief, Ripani's and Charter Up's misappropriation of the TMS Confidential Proprietary Information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

56.     The Confidential and Proprietary Information misappropriated by Ripani and Charter Up derives economic value to TMS from not being generally known to its competitors through proper means.

57.     As a direct and proximate result of Ripani's and Charter Up's wrongful conduct, TMS has been irreparably injured and has suffered damages exceeding $75,000.00 and will continue to suffer damages.

WHEREFORE, Plaintiff TMS seeks entry of judgment against Defendants Ripani and Charter Up pursuant to the Prayer for Relief set forth below.

## COUNT TWO
**Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (Against All Defendants)**

58.     TMS repeats and realleges each and every allegation contained in the prior paragraphs of this Complaint, as if fully set forth at length herein.

59.     As alleged above, Ripani misrepresented to TMS the operability of his TMS-issued laptop – the First Ripani Laptop – for the purposes of obtaining a new laptop from TMS, and thereafter failed to return the First Ripani Laptop to TMS.

60.     Following the termination of his employment with TMS, Ripani began his employment with Charter Up and has continued to use the First Ripani Laptop to Charter Up's benefit.

61.     Since beginning his employment with Charter Up, Ripani has intentionally, and without authorization, accessed TMS's cloud-based systems to obtain TMS's Confidential and

Proprietary Information through the First Ripani Laptop, in direct violation of the terms and conditions of his employment and company policy.

62.    Ripani obtained such information from TMS's protected cloud-based server system, which is connected to the Internet and is used in interstate and foreign commerce, without authorization and obtained information therefore, in violation of 18 U.S.C. §§ 1030(a)(2)(C), (a)(4), (a)(5)(B), and (a)(5)(C).

63.    Ripani's access of TMS's cloud-based system was completely unauthorized for the purpose in which he accessed the system, particularly where he accessed the system *after* his employment with TMS ended. Ripani purposefully misled TMS to believe that the First Ripani Laptop was inoperable and convinced TMS to send him the Second Ripani Laptop. When he resigned from his employment with TMS, he returned the Second Ripani Laptop, but retained the First Ripani Laptop, which was in fact in operation. Following his resignation, Ripani used the First Ripani Laptop to continue to access his TMS email account and TMS documents, including documents created and maintained *after* his employment ended.

64.    Ripani accessed TMS's cloud-based systems with the intent to steal, deprive, and defraud TMS of its data and records and to use those data and records for improper purposes on behalf of himself and Charter Up, to the detriment of TMS.

65.    Ripani was not authorized to access TMS's computer system or database for the purpose of copying TMS's data and records from that computer system, including for purposes inimical and injurious to TMS and its interests following his resignation from employment.

66.    By means of this conduct, Ripani knowingly and intentionally obtained valuable proprietary and confidential information and trade secrets from TMS's computer system and for the purpose of conspiring with Charter Up to improperly steal TMS's business.

67.     Upon information and belief, Charter Up was aware that Ripani was continuing to access TMS's cloud-based systems and take TMS data and records to use on Charter Up's behalf for the purpose of unfairly competing for TMS's customers.

68.     In taking the above actions, Ripani and Charter Up have damaged TMS in that, among other things, Ripani has caused competitive harm to TMS, and has caused TMS to expend resources to investigate the unauthorized access and to prevent such access from continuing. The losses caused by Ripani as a result exceeded $5,000 within a period of one year in violation of the law including, but not limited to, 18 U.S.C. § 1030(c)(4)(A)(i)(I).

69.     As a direct and proximate result of the wrongful conduct of Ripani, TMS has been irreparably injured and has suffered damages exceeding $75,000.00.

WHEREFORE, Plaintiff TMS seeks entry of judgment against Defendant Ripani pursuant to the Prayer for Relief set forth below.

## COUNT THREE
### Trade Secret Misappropriation Under the Maryland Uniform Trade Secrets Act, Commercial Law Article § 11-1201, *et seq*. (Against All Defendants)

70.     TMS repeats and realleges each and every allegation contained in the prior paragraphs of this Complaint, as if fully set forth at length herein.

71.     The TMS Confidential and Proprietary Information contained confidential and trade secret documents and information including financial, business and technical information generated by TMS.

72.     The TMS Confidential and Proprietary Information relates to services used in, or intended to be used in interstate or foreign commerce.

73.     TMS has taken reasonable steps to protect the secrecy of its Confidential and Proprietary Information, including the secrecy of the TMS Confidential and Proprietary Information that Ripani has stolen and Ripani and Charter Up have misappropriated.

74.     Ripani and Charter Up have misappropriated the TMS Confidential and Proprietary Information by (1) acquiring same, knowing and/or having reason to know that the trade secrets were acquired by improper means, including by the theft, misrepresentation, and/or breach of an express and/or implied duty to maintain the secrecy of, and/or (2) using or disclosing the trade secrets after acquiring them through improper means.

75.     Ripani and Charter Up have failed to return to TMS its Confidential and Proprietary Information and have attempted to conceal Ripani's theft of such information.

76.     Upon information and belief, Ripani's and Charter Up's misappropriation of the TMS Proprietary Information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

77.     The Confidential and Proprietary Information misappropriated by Ripani and Charter Up derives economic value to TMS from not being generally known to its competitors through proper means.

78.     As a direct and proximate result of the wrongful conduct of Ripani and Charter Up, TMS has been irreparably injured and has suffered damages exceeding $75,000.00, and will continue to suffer damages.

WHEREFORE, Plaintiff TMS seeks entry of judgment against Defendants Ripani and Charter Up pursuant to the Prayer for Relief set forth below.

**<u>COUNT FOUR</u>**
**Common Law Conversion (Against All Defendants)**

79.     TMS repeats and realleges each and every allegation contained in the prior paragraphs of this Complaint, as if fully set forth at length herein.

80.     Ripani and Charter Up physically interfered with TMS's use of its Confidential and Proprietary Information when Ripani obtained TMS's Confidential and Proprietary Information through unauthorized access to TMS's cloud-based systems, with bad faith and intent to use the Confidential and Proprietary Information to the detriment of TMS and to the benefit of Charter Up.

81.     Charter Up continues to utilize TMS's Confidential and Proprietary Information despite receiving TMS's Cease and Desist letters, to the detriment of TMS.

82.     The actions of Ripani and Charter Up, as set forth herein, constitutes conversion of TMS's trade secrets.

83.     As a direct and proximate result of the wrongful conduct of Ripani and Charter Up, TMS has been irreparably injured, has suffered damages exceeding $75,000.00, and will continue to suffer damages.

WHEREFORE, Plaintiff TMS seeks entry of judgment against Defendants Ripani and Charter Up pursuant to the Prayer for Relief set forth below.

<u>**COUNT FIVE**</u>
**Common Law Conversion (Against Ripani)**

84.     TMS repeats and realleges each and every allegation contained in the prior paragraphs of this Complaint, as if fully set forth at length herein.

85.     Ripani physically interfered with TMS's property (*i.e.* the First Ripani Laptop) when Ripani failed to return the First Ripani Laptop to TMS following TMS's request.

86.    Ripani's actions of retaining TMS's property longer that TMS permitted him to do so, and with disregard to TMS's request otherwise, amounts to a conversion of the First Ripani Laptop.

87.    As a direct and proximate result of the wrongful conduct of Ripani, TMS has been irreparably injured, has suffered damages exceeding $75,000.00, and will continue to suffer damages.

WHEREFORE, Plaintiff TMS seeks entry of judgment against Defendant Ripani pursuant to the Prayer for Relief set forth below.

**COUNT SIX**
**Common Law Breach of Fiduciary Duty and Duty of Loyalty (Against Ripani)**

88.    TMS repeats and realleges each and every allegation contained in the prior paragraphs of this Complaint, as if fully set forth at length herein.

89.    As an employee of TMS, Ripani owed TMS a duty of loyalty and was obligated to act with the utmost good faith, and in the best interest of TMS.

90.    TMS was entitled to place its trust and confidence in Ripani, and was entitled to expect him to act with the utmost good faith toward it in carrying out his employment duties and business of TMS.

91.    TMS relied on the loyalty and integrity of Ripani and his faithful performance of his responsibilities.

92.    Ripani took advantage of TMS's faith in him – thereby breaching his fiduciary duties –by acting in conflict with TMS's interest, by engaging in activities for his own benefit and the benefit of Charter Up, to the detriment of TMS, by purposefully withholding the return of the First Ripani Laptop, to wrongfully maintain access to TMS's cloud-based systems after the

termination of his employment and, upon information and belief, by providing TMS's Confidential and Proprietary Information to Charter Up and/or using that information in conducting Charter Up's business.

93.     Ripani knowingly and willingly breached his duty of loyalty to TMS by misappropriating TMS's Confidential and Proprietary Information, and engaging in acts that undermined TMS's business operations.

94.     Ripani acted in a manner inconsistent with his agency and trust by misappropriating TMS's Confidential and Proprietary Information to the injury of TMS and for his own benefit and the benefit of Charter Up, and by acting against TMS's interests during and after his employment by TMS.

95.     As a direct and proximate cause of the disloyalty of Ripani and breach of his duties, TMS has been and is being harmed, and faces risk of irreparable harm.

96.     Ripani is still in possession of the First Ripani Laptop and TMS's Confidential and Proprietary Information, continues to access that information, and is able to use that information to benefit Charter Up and to the detriment of TMS.

97.     As a direct and proximate result of the wrongful conduct of Ripani, TMS has been irreparably injured, has suffered damages exceeding $75,000.00, and will continue to suffer damages.

WHEREFORE, Plaintiff TMS seeks entry of judgment against Defendant Ripani pursuant to the Prayer for Relief set forth below.

## COUNT SEVEN
### Common Law Fraud or Deceit (against Ripani)

98.     TMS repeats and realleges each and every allegation contained in the prior paragraphs of this Complaint, as if fully set forth at length herein.

99.     Shortly before his voluntary resignation with TMS, Ripani knowingly lied and falsely asserted that the First Ripani Laptop was inoperable, with the intent to wrongfully obtain the Second Ripani Laptop for the purpose of defrauding TMS into supplying the Second Ripani Laptop and retain possession of the First Ripani Laptop after his resignation.

100.    TMS relied on Ripani's misrepresentations regarding the operability of the First Ripani Laptop in good faith and trusted Ripani that his statements were true and accurate.

101.    Ripani took advantage of TMS's good faith reliance by using the First Laptop after his employment ended to gain unauthorized access to TMS's cloud-based systems with the intent to steal TMS's Confidential and Proprietary Information, which he then used to underbid TMS in contract negotiations with TMS's clients, on behalf of Charter Up.

102.    As a direct and proximate cause of Ripani's misrepresentation, TMS has been irreparably injured and has suffered damages exceeding $75,000.00, and will continue to suffer damages.

WHEREFORE, Plaintiff TMS seeks entry of judgment against Defendant Ripani pursuant to the Prayer for Relief set forth below.

## COUNT EIGHT
**Tortious Interference with Prospective Business Relations (against all Defendants)**

103.    TMS repeats and realleges each and every allegation contained in the prior paragraphs of this Complaint, as if fully set forth at length herein.

104.    Ripani intentionally and willfully misrepresented the condition of the First Ripani Laptop with the intent to receive the Second Ripani Laptop and retain the First Ripani Laptop following the end of his employment.

105.    Following his resignation, Ripani intentionally and willfully used the First Ripani Laptop to access TMS's cloud-based systems repeatedly on at least fifteen (15) occasions – and

even after receiving a cease and desist letter from TMS - to steal TMS's Confidential and Proprietary information, which he then used against TMS to underbid TMS in contract negotiations with TMS's clients on behalf of Charter Up.

106.    Ripani's unauthorized access to TMS's cloud-based system caused damages and loss to TMS, as TMS lost clients it has serviced for years.

107.    Ripani was never justified in accessing TMS's cloud-based systems post-resignation and did so through false misrepresentations, deceit, and fraud. Chater Up was never justified in using TMS's Confidential and Proprietary Information, fraudulently obtained by Ripani.

108.    Ripani's intentional and willful actions of gaining unauthorized access to TMS's software and stealing its proprietary information and Chater Up's intentional and willful actions of using TMS's Confidential and Proprietary Information illegally obtained by Ripani against TMS – even after receiving a cease and desist letter from TMS - constitutes malice.

109.    As a direct and proximate cause of Ripani and Charter Up's intentional interference with TMS's business, TMS has been irreparably injured, suffered damages exceeding $75,000.00, and will continue to suffer damages.

WHEREFORE, Plaintiff TMS seeks entry of judgment against Defendants Ripani and Charter Up pursuant to the Prayer for Relief set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, TMS demands judgment against Ripani on all Counts of the Complaint that includes the entry of an Order:

A. Preliminarily and permanently enjoining and restraining Ripani, Charter Up, and those persons in active concert and participation with Defendants who

receive actual notice of the Court's order by personal service or otherwise, from any implementation, modification, or customization of its business practices or operations, including without limitation its use of TMS's Confidential and Proprietary Information, or any other trade secrets or internal, proprietary, or confidential documents, data, or information of TMS;

B. Preliminarily and permanently enjoining and restraining Ripani, Charter Up, and those persons in active concert and participation with Defendants who receive actual notice of the Court's order by personal service or otherwise, from the disclosure or use of TMS's Confidential and Proprietary Information or any other trade secrets or internal, proprietary, or confidential documents, data, or information of TMS;

C. Preliminarily and permanently enjoining and restraining Ripani, Charter Up, and those persons in active concert and participation with Defendants who receive actual notice of the Court's order by personal service or otherwise, from reproducing or otherwise using TMS's Confidential and Proprietary Information, and any and all internal, confidential, proprietary, and/or trade secret documents, data, and/or information belonging to TMS;

D. Preliminarily and permanently enjoining and restraining Ripani, Charter Up, and those persons in active concert and participation with Defendants who receive actual notice of the Court's order by personal service or otherwise, from viewing TMS's Confidential and Proprietary Information or any other trade secrets or internal, proprietary, or confidential documents, data, or information

of TMS, in his possession which has not yet been viewed by Ripani, Charter Up, or any persons acting on their behalf;

E.  Requiring Ripani, Charter Up, and those persons in active concert and participation with Defendants who receive actual notice of the Court's order by personal service or otherwise, to immediately return all records related to TMS in their possession including TMS's Confidential and Proprietary Information, all trade secrets or internal, confidential, or proprietary information, belonging to TMS, and any copies thereof, to TMS, including but not limited to, documents, e-mails, customer lists, spreadsheets, computer files, financial information, and all other information concerning TMS;

F.  Requiring Ripani and those persons in active concert and participation with Ripani who receive actual notice of the Court's order by personal service or otherwise, to immediately return all equipment belonging to TMS in their possession, including any computer equipment, in the same condition and working order as when Ripani's employment with TMS ended;

G.  Requiring Ripani, Charter Up, and those persons in active concert and participation with Defendants who receive actual notice of the Court's order by personal service or otherwise, to immediately disclose to TMS each person, including individuals and business entities, with whom they have shared TMS's Confidential and Proprietary Information, trade secrets, or data (electronic or otherwise), including any and all documents, data, or information in their possession, custody, or control;

H.  Directing Ripani and those persons in active concert and participation with Ripani who receive actual notice of the Court's order by personal service or otherwise, to preserve Ripani's personal and business computers and electronic storage devices to determine the extent of information and company property that was copied from TMS's computer network(s) and, to that end, order Ripani to (i) refrain from taking any action to destroy, discard, tamper with, or delete any electronic or written communications, documents, materials, and any and all information in Ripani's possession, custody, or control relating to TMS's Confidential and Proprietary Information, all trade secrets or internal, confidential, or proprietary data or information belonging to TMS, and any copies thereof; (ii) take all steps necessary to ensure preservation of all communications in connection with TMS's Confidential and Proprietary Information, all trade secrets or internal, confidential, or data or information belonging to TMS, and any copies thereof, including all electronically formatted or stored documents in Ripani's possession, custody, or control; and (iii) adjust any document retention or destruction policy and all computer backup protocols to ensure that preservation of TMS's Confidential and Proprietary Information, all trade secrets or internal or confidential data or information belonging to TMS, and any copies thereof;

I.  Directing Ripani and those persons in active concert and participation with Ripani who receive actual notice of the Court's order by personal service or otherwise, to allow TMS, or its agent, (i) access to Ripani's business and personal computers and electronic storage devices to determine the extent of

23

information and company property that was copied from TMS's computer network(s) and/or including or related to TMS's Confidential and Proprietary Information, and (ii) the right to copy any such devices at Ripani's expense;

J.   The appointment of a Special Master paid for by Ripani and Charter Up to ensure that no propriety or confidential information belonging to TMS is used by Defendants in the future;

K.   Awarding compensatory, consequential, and punitive damages arising out of Defendants' conduct given that their conduct was intentional, knowing, willful, malicious, fraudulent, and oppressive;

L.   Awarding costs and counsel fees incurred in this action as required;

M.   Ordering expedited discovery; and

N.   Granting such other and further relief as this Court deems equitable and just.

## JURY DEMAND

The Plaintiff hereby demands a jury trial as to all issues triable by a jury.

*/s/ Jennifer L. Curry, Esq.*
Jennifer L. Curry, Esq., Bar No.: 29038
jcurry@bakerdonelson.com
Gillian Felix, Esq., Bar No.: 21717
gfelix@bakerdonelson.com
BAKER,   DONELSON,   BEARMAN,
CALDWELL & BERKOWITZ, P.C.
100 Light Street, 19th Floor
Baltimore, MD 21202
(410) 862 – 1183 (Phone)
(410) 547 – 0699 (Fax)

## <u>VERIFICATION</u>

Michael Moulton, President of Transportation Management Services, Inc., verifies under penalty of perjury pursuant to 28 U.S.C. § 1746 that the factual statements contained in the foregoing Verified Complaint are true and correct to the best of his knowledge, information and belief.

DocuSigned by:

*Michael Moulton*

7DBDC933D9FA4A7...

Michael Moulton, President
Transportation Management Services, Inc.

Respectfully submitted,

*/s/ Jennifer L. Curry, Esq.*
Jennifer L. Curry, Esq., Bar No.: 29038
jcurry@bakerdonelson.com
Gillian Felix, Esq., Bar No.: 21717
gfelix@bakerdonelson.com
BAKER,    DONELSON,    BEARMAN,
CALDWELL & BERKOWITZ, P.C.
100 Light Street, 19th Floor
Baltimore, MD 21202
(410) 862 – 1183 (Phone)
(410) 547 – 0699 (Fax)