## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| TRANSPORTATION MANAGEMENT SERVICES, INC., <br> 46 S. Market Street, 2nd Floor <br> Frederick, MD 21701 <br><br>      Plaintiff, <br><br>      v. <br><br> ANDREW RIPANI <br> 17135 E. Neu Towne Pkwy. <br> Parker, CO 80134 <br><br>      and <br><br> CHARTERUP <br> 3340 Peachtree Rd. NE, Suite 100 <br> Atlanta, GA 30326 <br> Serve On: <br> Registered Agent: Armir Mehmeti <br> 3340 Peachtree Rd. NE, Suite 100 <br> Atlanta, GA 30326 <br><br>      and <br><br> Tailtiu Event Services, Inc. <br> 1285 Chipeta Road <br> Montrose, CO 81403 <br> Serve On: <br> Registered Agent: Eric Carroll <br> 1313 Mayfly Drive <br> Montrose, CO 81401 <br><br>      and <br><br> Timothy Gerrity <br> 10820 Woodstream Ct. <br> Las Vegas, NV 89135 <br><br>      Defendants. | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> Case No.: 1:25-cv-00135-ABA <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## AMENDED COMPLAINT
## FOR PERMANENT INJUNCTIVE AND OTHER RELIEF

Plaintiff Transportation Management Services, Inc. ("TMS"), by and through its undersigned counsel, hereby file this Amended Complaint against CharterUP, LLC ("CharterUP"), Andrew Ripani ("Ripani"), Tailtiu Event Services, Inc. ("Tailtiu"), and Timothy Gerrity ("Gerrity") (jointly referred to herein as "Defendants"), alleging as follows:

## NATURE OF THE ACTION

1.      This is an action by TMS for permanent injunctive relief against CharterUP and Ripani, as well as compensatory, consequential, punitive, and treble damages and legal fees, associated with Ripani's unlawful access to TMS's computer systems, resulting in his and CharterUP's misappropriation of TMS's proprietary and confidential business information and trade secrets in order to unfairly compete against TMS in the events-related transportation and parking industry.

2.      This is also an action by TMS for permanent injunctive relief, as well as compensatory, consequential, punitive, and treble damages and legal fees, against all Defendants, associated with the conspiracy by and between all Defendants as it relates to their collective scheme to rig the bidding process related to event transportation and parking management services, in an effort to damage TMS, deny TMS the opportunity to fairly compete in its industry, and restrain TMS from engaged in trade.

3.      Defendants' unlawful competitive efforts constitute violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1839, *et seq*.; the Sherman Act, 15 U.S.C. § 1; the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(4); the Maryland Uniform Trade Secrets Act, Commercial Law Article § 11-1201, *et seq*; and the common law of the State of Maryland.

4.     TMS will suffer irreparable harm in the event that Ripani and CharterUP are not permanently enjoined from the use and misappropriation of TMS's confidential and proprietary business information and trade secrets and the continued anti-competitive conduct of bid-rigging and price fixing.

5.     TMS is a Maryland limited liability company providing events-related transportation and parking services to its clients across the world. TMS conducts its principal management operations in Fredrick, Maryland. TMS provides events-related transportation and parking services throughout the United States, by planning, managing, and providing transportation and parking services for events and coordinating the logistics of the transportation and parking services provided to each client.

6.     CharterUP is a Georgia limited liability company providing events-related transportation and parking services to clients throughout the United States. CharterUP conducts its principal management operations in Atlanta, Georgia.

7.     Ripani is a former employee of TMS, who held the position of Director of Customer Development and is now a current employee of CharterUP. Ripani resides at 17135 E. Nue Towne Parkway, Parker, Colorado 80134.

8.     Tailtiu is a Colorado limited liability company providing event planning and transportation services to clients throughout the United States. Tailtiu conducts its principal management operations in Montrose, Colorado.

9.     Gerrity is the co-founder and a member of Tailtiu. Gerrity resides at 10820 Woodstream Court, Las Vegas, Nevada 89135.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 18 U.S.C. §§ 1030(g), 15 U.S.C. § 1, and 1836(c).

11.     Venue is proper pursuant to 28 U.S.C. U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims alleged herein arose in this District. Venue is also proper under 28 U.S.C. § 1391(c)(2) because CharterUP is subject to the Court's personal jurisdiction with respect to the civil action in question.

## FACTS COMMON TO ALL COUNTS

### A.   The Business of Transportation Management Services

12.     For the past twenty-nine years, TMS has become a leader in the events-related transportation and parking industry, assisting national and international clients with the planning, coordinating, facilitating and managing of transportation and parking services for large and often high-profile events.

13.     TMS distinguishes itself from other events-related transportation and parking companies through the utilization of data-driven technology that TMS has developed and employed to ensure efficiency, safety, and customer satisfaction for each event.

14.     TMS has expended millions of dollars in research, development, and implementation of unique products, pricing models, marketing strategies, and customer acquisition strategies to become a leader and trusted vendor in the event transportation and parking management industry.

### B. TMS Policies

15.     TMS maintains an Employee Handbook with policies that govern the conduct of, and expectations for, all TMS employees, which is distributed to each employee at the start of their employment with TMS.

16.     TMS maintains a "Confidential Company Information" policy in its Employee Handbook, which prohibits the use or disclosure of confidential information and trade secrets, defined as information related to TMS's business, obtained through employment with TMS, including, but not limited to, financial information, new product development, marketing strategies, customer lists, and potential customer leads.

17.     TMS also maintains an "Intellectual Property" policy, which prohibits the unauthorized use of TMS's intellectual property, to include but not be limited to, TMS's print materials and software. TMS's confidential company information, trade secrets, and intellectual property as defined in the applicable policies is referred to herein as "TMS Confidential and Proprietary Information."

18.     TMS also maintains a policy in its Employee Handbook that governs the termination procedures for all TMS employees (the "Procedures Upon Termination" policy). These procedures require the return of all TMS property including, but not limited to, laptop computers, to TMS, as well as the return of all TMS Confidential and Proprietary Information by all employees whose employment with TMS has been terminated.

### C. TMS Safeguards and Protects its Confidential and Proprietary Information

19.     In its operations, TMS produces and maintains its Confidential and Proprietary Information that has independent economic value. TMS has taken, and continues to take,

appropriate steps to protect the confidentiality of its Confidential and Proprietary Information, including in the following ways:

a. The policies governing Confidential Company Information, Proprietary Information, and Procedures Upon Termination are maintained in the TMS Employee Handbook, which is distributed to all TMS employees at the start of employment.

b. TMS requires all employees to sign acknowledgments of receipt of the TMS Employee Handbook, which includes receipt of the policies stated therein, including the Confidential Company Information, Intellectual Property, and Procedures Upon Termination policies.

c. Access to Confidential and Proprietary Information is restricted internally to TMS personnel who have a need to know or access to such information, based upon the position they hold and/or the work they perform for TMS. Such information is not known or disclosed outside of TMS, unless specifically authorized by TMS and subject to controls by TMS's IT department.

d. Employees are expected to return all company equipment, including laptops and Confidential and Proprietary Information, upon termination of employment.

### D.  Ripani's Hiring and Scope of Employment with TMS

20.    Ripani was hired by TMS as the Director of Customer Development on June 22, 2020.

21.    Ripani acknowledged receipt of the TMS Employee Handbook containing TMS's policies via electronic signature on June 30, 2020.

6

22.     As Director of Customer Development, Ripani's primary job duties included generating, cultivating, and maintaining new business for TMS outside of the convention and tradeshow markets, which included the high-profile entertainment space such as concerts, festivals, and sporting events.

23.     During the course of his employment, Ripani had access to Confidential and Proprietary Information related to TMS's financing, pricing information, marketing strategies, and customer lists.  Ripani used this information to generate, cultivate, and maintain business for TMS.

**E.  *During his Employment with TMS, Ripani Forms a Relationship with Timothy Gerrity.***

24.     Years prior to Ripani's employment with TMS, TMS worked closely with Timothy Gerrity, who operated as a third-party contractor facilitating transportation and parking for major sporting and musical events, such as Coachella and Formula 1 Las Vegas Grand Prix, and developed a close business relationship with him.

25.     Gerrity regularly served as TMS's contact for particular customer events, which often meant that TMS presented Gerrity with proposals or bids for work, which he then assessed, negotiated, and accepted on behalf of the customer.

26.     Upon joining TMS and throughout the course of his employment, Ripani was assigned to maintain and cultivate certain clients and events managed by Gerrity, which included, but was not limited to, the California Nurses Association, Aftershock, GoldenSky, and Rolling Loud events.

27.     In particular, in 2023, Ripani was tasked with working with Gerrity to facilitate the event transportation and parking management services for the Rolling Loud event.

28.     While doing so, Ripani and Gerrity worked closely together, and upon completion of the Rolling Loud event, promised to continue working together in the future.

29.     TMS would soon learn that the trust it placed in Gerrity and Ripani was misplaced.

**F. Less Than Two Months Before Resigning from TMS, Ripani Claims Under False Pretenses That His First Laptop is Inoperable and Requests a New Laptop.**

30.     At the time of his hire by TMS, Ripani was provided with a laptop to allow him to work remotely from his home in Parker, Colorado (the "First Ripani Laptop").

31.     On each occasion when Ripani logged into TMS's cloud-based system remotely using the First Ripani Laptop during the course of his employment, the name "ARipani" and an IP address in Colorado were recorded.

32.     On November 8, 2023, Ripani notified IT Manager Christopher Hall via electronic mail that the First Ripani Laptop was inoperable and he requested a new laptop be issued to him. In response, TMS issued Ripani a new laptop the same day (the "Second Ripani Laptop").

33.     Upon receipt of the Second Ripani Laptop, Ripani did not return the First Ripani Laptop to TMS. Because TMS trusted Ripani's assertion that it was inoperable, TMS did not initially request that he return the First Ripani Laptop. As noted below, TMS would later learn that Ripani's representation regarding the operability of the First Ripani Laptop was dishonest.

34.     Less than two months later, on January 19, 2024, Ripani submitted his resignation from his employment with TMS.

35.     On February 1, 2024, TMS requested that Ripani return all company-issued equipment, including both the First and Second Ripani laptops, to TMS.

36.     Ripani returned the Second Ripani Laptop as requested, but failed to return the First Ripani Laptop. Again, TMS was not concerned, at that time, with Ripani's failure to return the First Ripani Laptop, because it relied upon his misrepresentation that the First Ripani Laptop was inoperable. TMS's trust in Ripani's misrepresentations would ultimately prove detrimental to TMS.

37.    Ripani's last day of employment with TMS was February 2, 2024. TMS immediately disabled Ripani's password to TMS's cloud-based system following his last day.

### G. *Ripani Begins Employment with CharterUp and Uses TMS's Confidential and Proprietary Information to Steal TMS's Customers, Resulting in Millions of Dollars of Damages to TMS.*

38.    Upon information and belief, Ripani began his employment with CharterUP in February 2024.

39.    TMS provided transportation services for the Aftershock event in 2023 and has been a vendor for Aftershock's production company, Danny Wimmer Presents ("DWP"), for more than 9 years, since August 2015. Throughout his employment with TMS, Ripani was assigned the responsibility of coordinating all of TMS's music festival business, which included the Aftershock event and, to prepare competitive proposals for TMS to provide the transportation and parking services for the event each year.

40.    Prior to leaving TMS, one of Ripani's final duties was to provide input for TMS's response to DWP's Request for Proposal for the 2024 Aftershock event.

41.    In July 2024 TMS learned that – *for the first time in five years –*it had not been awarded the Aftershock event, but that the transportation and parking services for the event would be provided by CharterUP.

42.    Upon information and belief, the proposal to DWP for the 2024 Aftershock event submitted by CharterUP mirrored the proposal submitted by TMS exactly except that the TMS proposal included a management fee that is standard in all TMS proposals, and the CharterUP proposal did not. TMS learned that not only was this management fee the _only_ difference between the two proposals but that the management fee in the TMS proposal (or the lack thereof in the

CharterUP proposal) was the deciding factor in DWP's decision to award the Aftershock event to CharterUP.

43.    Having learned that Ripani had been hired by CharterUP, and finding the events of the Aftershock proposal and award suspicious, TMS conducted an internal audit of the login attempts by the "ARipani" account to determine if Ripani had taken or accessed TMS's Confidential and Proprietary Information and its Aftershock proposal, in particular. The results of the audit were alarming, to say the least.

44.    The audit revealed that following his resignation from TMS, Ripani – through the "ARipani" account – had accessed TMS's cloud-based system on several occasions following the termination of his employment, despite the fact that TMS disabled his password. Upon receipt of the audit information, TMS immediately disabled Ripani's login information (again), just as it had done when his employment ended.

45.    Nonetheless, it became clear to TMS that although the "ARipani" password had been reset, Ripani was somehow continuing to access TMS's systems and its Confidential and Proprietary Information, when TMS lost bids to CharterUP for two additional events – Goldensky and Rolling Loud – that it had serviced for several years prior to Ripani's intrusions.

46.    Accordingly, on September 6, 2024, TMS transmitted correspondence to CharterUP, advising the company of Ripani's illegal conduct and demanding that CharterUP prohibit Ripani from continuing to access TMS's Confidential and Proprietary Information and that CharterUP cease and desist its use of the information (the "CharterUP Cease and Desist Letter"). A true and correct copy of the Cease and Desist Letter is attached hereto as Exhibit A.

47.    Additionally, on September 17, 2024, TMS transmitted correspondence to Ripani directing him to immediately discontinue accessing TMS's cloud-based system and, in turn, its

Confidential and Proprietary Information, as well as using that Confidential and Proprietary Information in his work for CharterUP ("Ripani Cease and Desist Letter"). A true and correct copy of the Cease and Desist Letter is attached hereto as Exhibit B.

48.     When TMS received no response to its Cease and Desist Letters from CharterUP or Ripani, TMS grew concerned that CharterUP's and Ripani's conduct would not stop. Thus, to confirm whether Ripani was continuing his unauthorized access of TMS's Confidential and Proprietary Information. TMS therefore referred this matter to a third-party forensic auditor, who conducted a second forensic analysis of the "ARipani" account.

49.     Through that second forensic analysis, TMS learned that Ripani has defied TMS's Cease and Desist Letter issued to him to discontinue accessing TMS's electronic systems. *See* the Declaration of Forensic Expert, Kaylin Malutich ("Malutich Decl."), attached as Exhibit C.

50.     In fact, the log entries from the forensic analysis revealed that Ripani was able to continue his access to TMS's cloud-based system using the First Ripani Laptop to access TMS's electronic systems, post termination, on at least fifteen (15) occasions – from March 4, 2024 to October 24, 2024 – to access TMS's Confidential and Proprietary Information. In fact, Ripani accessed TMS's cloud-based system on at least three occasions – September 8, October 5, and October 15 – after TMS sent its Cease and Desist Letters. There is no justification for Ripani's actions with respect to use of TMS's devices or access of TMS's electronic cloud-based systems following the termination of his employment and TMS's Cease and Desist Letter.

51.     Similarly, once TMS put CharterUP on notice that its employee, Ripani, had stolen TMS information and was using that information in the course of his employment with CharterUP, it should have taken action to stop and prevent further unlawful behavior by Ripani. Instead, not only did CharterUP permit Ripani to access TMS's cloud-based systems but it clearly continued

to use the fruits of Ripani's unlawful activities. There is no justification for CharterUP allowing its employee to continue to steal and use TMS's Confidential and Proprietary Information during the course of his work for CharterUP.

52.    By hiring and continuing to employ Ripani, CharterUP has gained access to TMS's Confidential and Proprietary Information, including its long-standing client proposals, pricing models, customer lists, and marketing strategies, that will aid its procurement of clients to the detriment of TMS and its competitive advantage in this space.

53.    To date, neither Ripani nor CharterUP has responded to TMS's requests. Accordingly, concerned that Ripani and CharterUP would continue to steal and use its Confidential and Proprietary Information, TMS retained outside counsel and issued follow-up cease and desist requests, as well as preservation of records notices. True and correct copies of the preservation notices issued to Ripani and CharterUP on October 16, 2024, are attached hereto as Exhibits D and E, respectively.

54.    Ripani's theft and misappropriation of TMS's Confidential and Proprietary Information was intentional, knowing, willful and malicious. In other words, Ripani was using the First Ripani Laptop he stole from TMS to strategically raid TMS's Confidential and Proprietary Information for use in his new employment with CharterUP, in violation of the DTSA, the CFAA, and Maryland law.

55.    CharterUP's refusal to stop and prevent Ripani's continued theft of TMS's Confidential and Proprietary Information, as well as CharterUP's decision to continue to use that stolen information during the course of its business, was intentional, knowing, willful, and malicious.

56.    In addition to learning of Ripani's misappropriation of TMS's Confidential and Proprietary Information, TMS also learned that Ripani engaged in an unlawful conspiracy with Gerrity, to solicit proposals from TMS under the guise of fair competition and under false pretenses, for CharterUP to use those proposals to undercut TMS and steal its long-standing customers.

### H. Gerrity and Ripani Conspire to Undercut TMS's Bids and Restrain its Trade, Solely for the Benefit of CharterUP.

57.    Meanwhile, at or around the same time that Ripani resigned from his employment TMS, Gerrity started his own event services company, Tailtiu Event Services, LLC, in January 2024.

58.    Shortly after its formation, Tailtiu was awarded a contract with DWP, to manage transportation and parking services for all DWP festivals, including Aftershock and GoldenSky events[1].

59.    The following month, in February 2024, Ripani began his employment with CharterUp and immediately contacted Gerrity to solicit work. Ripani and Gerrity soon agreed that "wherever [they] end up . . . it [was] a good idea to keep working together" and Gerrity promised Ripani that CharterUP would be selected as the event transportation and parking management provider for all Tailtiu clients. (*See* March 25, 2024 email attached as Exhibit F).

60.    Thereafter, Gerrity and Ripani concocted a scheme to unlawfully rig the event transportation and parking management bidding process used by Tailtiu's customers' events, set an unreasonable restraint on trade to the detriment of TMS, and the transportation market generally.

---

[1] The "Aftershock" and "GoldenSky" festivals are multi-day events that take place in Sacramento, California. In addition to Aftershock and GoldenSky, DWP produces several other music festivals across the United States, including the "Louder than Life" festival and "Bourbon & Beyond" festival in Louisville, Kentucky, the "Sonic Temple" festival in Columbus, Ohio, the "Incarceration" festival in Mansfield, Ohio and the "Welcome to Rockville" festival in Daytona Beach, Florida.

61.     The bidding process in the event transportation and parking management industry is client dependent – meaning customers issue Requests For Proposals inviting transportation vendors to submit proposals on future projects, and vendors in turn prepare proposals in accordance with the customer's and event's needs. Preparing proposals in response to RFPs requires use of a vendor's confidential and proprietary information, including vendor rates and cost estimators. As a result, these bid proposals are confidential and amount to trade secrets.

62.     In accordance with this bidding process, on June 3, 2024, the Operations Manager for DWP, Steve Smith, contacted Ripani to "introduce" Tailtiu as its third-party contractor and advised that Gerrity would oversee facilitating the transportation and parking services for the Aftershock and GoldenSky events. He also advised that Gerrity would be handling the bidding process and would send an RFP directly to CharterUP via Ripani.

63.     Ripani responded to Mr. Smith and assured him that CharterUP would "put together as aggressive pricing [proposal] as possible to demonstrate [its] desire to work with [DWP]" and further told him that he "truly appreciated the opportunity" for CharterUP to be considered. Gerrity was copied on Ripani's email and aware of Ripani's promise to DWP. Importantly, however, as a result of their scheme, both Gerrity and Ripani already knew that CharterUP would be chosen to provide transportation and parking management services for the DWP events because Gerrity would be giving Ripani the proposals submitted by TMS, and other competitors, to allow CharterUP to undercut those proposals.

64.     To put this plan in motion, on June 4, 2024, Gerrity issued the AfterShock and GoldenSky RFP to TMS and requested a proposal to provide event transportation and parking management services for the events.

65.     On June 14, 2024, TMS submitted its confidential proposal to provide ground transportation for both events to Tailtiu and Gerrity and advised that it was "pleased to have the opportunity to partner with [Gerrity] and DWP on another exciting project." At the time, TMS clearly believed it had been given a fair opportunity to compete for these jobs.

66.     Hours later, Gerrity forwarded TMS's proposal to Ripani, and told him that TMS's proposal "[s]hould be easy [for CharterUP] to beat" and asked to discuss with Ripani how CharterUP could undercut TMS's bid to secure the jobs. A copy of the June 14 email is below:

---

### Fwd: TMS Aftershock and Golden Sky Ground Transportation Proposal

**Tim Gerrity** <tim@tailtiu.com>                                              Fri, Jun 14, 2024 at 2:50 PM
To: Andrew Ripani <andrew.ripani@charterup.com>, Eric Carroll <eric@tailtiu.com>

Should be easy to beat. Lets get on the phone Monday and discuss how can work for us all

---------- Forwarded message ---------
From: **Curtis Chiswell** <Cchiswell@tms.com>
Date: Fri, Jun 14, 2024 at 11:32 AM
Subject: TMS Aftershock and Golden Sky Ground Transportation Proposal
To: tim@tailtiu.com <tim@tailtiu.com>
Cc: Mike Moulton - tms <MMoulton@tms.com>, Tony Glibkowski <tglibkowski@tms.com>

Good afternoon Tim,

TMS is pleased to have the opportunity to partner with you and DWP on another exciting project. Attached is the proposal and costs for Aftershock and Golden Sky.

Please feel free to reach out to me with any questions or concerns.  We look forward to hearing from you.

Thanks,
Curtis


**Curtis Chiswell**

Operations Manager

TMS | Houston Office

DIRECT | (832) 925-9199



Facebook  LinkedIn  Twitter  tms.com

67.     Upon information and belief, Ripani used TMS's proposal to prepare CharterUP's bid to provide event transportation and parking management services at a slightly lower cost. Ripani and Gerrity's plan apparently worked when CharterUP underbid TMS and won the AfterShock and GoldenSky work.

68.     On July 12, 2024, Gerrity contacted TMS and advised that DWP planned to "move forward with another vendor" and that the decision was "purely financial." Gerrity further advised that he expected to "always get a quote from TMS" and looked forward to working with TMS on events in the future.

69.     As a result of Defendants' anticompetitive conduct alleged herein, competition between TMS and CharterUP has been unlawfully restrained or altogether eliminated for a significant portion of TMS's market, particularly as DWP conducts festivals throughout the United States.

70.     Upon information and belief, to date, Gerrity has continued his scheme of seeking proposals from TMS and other event transportation and parking management providers under false pretenses and the guise of fair competition, with the intent to share those proposals with CharterUP, allowing it and Ripani to submit lower bids undercutting those proposals to the benefit of CharterUP.

71.     With TMS's Confidential and Proprietary Information in hand, and Gerrity's assistance in rigging the bidding process through Tailtiu and fixing prices for CharterUP, Defendants have and will continue to harm TMS and prevent fair competition in the event transportation and parking management market generally.

16

72.    It is the purpose of this action to permanently enjoin (a) Ripani and CharterUP's continued use and possession of TMS's valuable Confidential and Proprietary Information, and (b) Defendants from engaging in bid rigging and price fixing to unlawfully restrain trade.

73.    TMS has spent millions of dollars on expenses, person-hours, trial-and-error, and overhead dedicated to creating and maintaining the aforementioned trade secrets and confidential information. To allow Ripani and CharterUP to continue their unlawful possession and use of TMS's misappropriated Confidential and Proprietary Information would allow them to reduce or limit TMS's competitive edge through unlawful activities when it would otherwise take Ripani and CharterUP years and millions of dollars for the time, labor, and expense to develop and achieve their own equivalent implementation of TMS's business practices.

74.    By reason of the alleged violations of the antitrust laws, TMS has sustained injury to its business, having lost jobs and the ability to compete fairly in the market as a result of Defendants' illegal contract, combination, or conspiracy. As a result, TMS has suffered damages.

75.    Defendants' unlawful agreement to rig the bidding process and fix contract prices amounts to an unreasonable restraint on trade and an anticompetitive effect on the event transportation and parking management services market, by destroying any competition amongst competitors of CharterUP with respect to customers associated with Tailtiu and Gerrity.

## COUNT ONE
### Trade Secret Misappropriation Under the Federal Defend Trade Secrets Act, 18 U.S.C. § 1839, *et seq.* (Against Ripani and CharterUP)

76.    TMS repeats and realleges each and every allegation contained in the prior paragraphs of this Amended Complaint, as if fully set forth at length herein.

77.    The TMS Confidential and Proprietary Information contains confidential and trade secret documents and information, including financial, business and technical information generated by TMS.

78.    The TMS Confidential and Proprietary Information relates to services used in, or intended to be used in interstate or foreign commerce.

79.    TMS has taken reasonable steps to protect the secrecy of its Confidential and Proprietary Information, including the secrecy of the TMS Confidential and Proprietary Information that Ripani retained and/or took from TMS since his employment ended and that he and CharterUP have misappropriated.

80.    Ripani and CharterUP have misappropriated the TMS Confidential and Proprietary Information by (1) acquiring same, knowing and/or having reason to know that the trade secrets were acquired by improper means, including by the theft, misrepresentation, and/or breach of an express and/or implied duty to maintain the secrecy of, and/or (2) using or disclosing the trade secrets after acquiring them through improper means.

81.    Upon information and belief, Ripani's and CharterUP's misappropriation of the TMS Confidential Proprietary Information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

82.    The TMS Confidential and Proprietary Information misappropriated by Ripani and CharterUP derives economic value to TMS from not being generally known to its competitors through proper means.

83.    As a direct and proximate result of Ripani's and CharterUP's wrongful conduct, TMS has been irreparably injured and has suffered damages exceeding $75,000.00 and will continue to suffer damages.

18

WHEREFORE, Plaintiff TMS seeks entry of judgment against Defendants Ripani and CharterUP pursuant to the Prayer for Relief set forth below.

## COUNT TWO
### Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (Against Ripani and CharterUP)

84.    TMS repeats and realleges each and every allegation contained in the prior paragraphs of this Amended Complaint, as if fully set forth at length herein.

85.    As alleged above, Ripani misrepresented to TMS the inoperability of his TMS-issued laptop – the First Ripani Laptop – for the purposes of obtaining a new laptop from TMS, and thereafter failed to return the First Ripani Laptop to TMS.

86.    Following his voluntary resignation from his employment with TMS, Ripani returned the Second Ripani Laptop but kept the First Ripani Laptop, again, under the auspices of it no longer being operable. TMS also disabled Ripani's access to its cloud-based systems.

87.    The First Ripani Laptop, however, was far from inoperable. In fact, Ripani had continued using the First Ripani Laptop during the remainder of his employment with TMS, and, despite TMS disabling his access, continued to access TMS's systems and various documents after his employment with TMS ended, including accessing documents TMS created *after* his employment ended.

88.    Ripani began his employment with CharterUP and has continued to use the First Ripani Laptop to CharterUP's benefit.

89.    Since beginning his employment with CharterUP, Ripani has intentionally, and without authorization, accessed TMS's cloud-based systems to obtain TMS's Confidential and Proprietary Information through the First Ripani Laptop, in direct violation of the terms and conditions of his employment and company policy.

90.    Ripani obtained such information from TMS's protected cloud-based server system, which is connected to the Internet and is used in interstate and foreign commerce, without authorization and obtained information therefrom, in violation of 18 U.S.C. §§ 1030(a)(2)(C), (a)(4), (a)(5)(B), and (a)(5)(C).

91.    Ripani's access of TMS's cloud-based system was completely unauthorized for the purpose in which he accessed the system, particularly where he accessed the system *after* his employment with TMS ended.

92.    Ripani accessed TMS's cloud-based systems with the intent to steal, deprive, and defraud TMS of its data and records and to use those data and records for improper purposes on behalf of himself and CharterUP, to the detriment of TMS.

93.    Ripani was not authorized to access TMS's computer system or database for the purpose of copying TMS's data and records from that computer system, including for purposes inimical and injurious to TMS and its interests following his resignation from employment.

94.    By means of this conduct, Ripani knowingly and intentionally obtained valuable proprietary and confidential information and trade secrets from TMS's computer system and for the purpose of conspiring with CharterUP to improperly steal TMS's business.

95.    Upon information and belief, CharterUP was aware that Ripani was continuing to access TMS's cloud-based systems following the end of his employment with TMS and beginning his new employment with CharterUP, and take TMS data and records to use on CharterUP's behalf for the purpose of unfairly competing for TMS's customers.

96.    In taking the above actions, Ripani and CharterUP have damaged TMS in that, among other things, Ripani has caused competitive harm to TMS, and has caused TMS to expend resources to investigate the unauthorized access and to prevent such access from continuing. The

losses caused by Ripani as a result exceeded $5,000 within a period of one year in violation of the law including, but not limited to, 18 U.S.C. § 1030(c)(4)(A)(i)(I).

97.     As a direct and proximate result of the wrongful conduct of Ripani, TMS has been irreparably injured and has suffered damages exceeding $75,000.00.

WHEREFORE, Plaintiff TMS seeks entry of judgment against Defendant Ripani pursuant to the Prayer for Relief set forth below.

**COUNT THREE**
**Trade Secret Misappropriation Under the Maryland Uniform Trade Secrets Act,**
**Commercial Law Article § 11-1201, *et seq*. (Against Ripani and CharterUP)**

98.     TMS repeats and realleges each and every allegation contained in the prior paragraphs of this Amended Complaint, as if fully set forth at length herein.

99.     The TMS Confidential and Proprietary Information contained confidential and trade secret documents and information including financial, business and technical information generated by TMS.

100.    The TMS Confidential and Proprietary Information relates to services used in, or intended to be used in interstate or foreign commerce.

101.    TMS has taken reasonable steps to protect the secrecy of its Confidential and Proprietary Information, including the secrecy of the TMS Confidential and Proprietary Information that Ripani has stolen and Ripani and CharterUP have misappropriated.

102.    Ripani and CharterUP have misappropriated the TMS Confidential and Proprietary Information by (1) acquiring same, knowing and/or having reason to know that the trade secrets were acquired by improper means, including by the theft, misrepresentation, and/or breach of an express and/or implied duty to maintain the secrecy of, and/or (2) using or disclosing the trade secrets after acquiring them through improper means.

103.    Ripani and CharterUP have failed to return to TMS its Confidential and Proprietary Information and have attempted to conceal Ripani's theft of such information.

104.    U0pon information and belief, Ripani's and CharterUP's misappropriation of the TMS Proprietary Information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

105.    The Confidential and Proprietary Information misappropriated by Ripani and CharterUP derives economic value to TMS from not being generally known to its competitors through proper means.

106.    As a direct and proximate result of the wrongful conduct of Ripani and CharterUP, TMS has been irreparably injured and has suffered damages exceeding $75,000.00, and will continue to suffer damages.

WHEREFORE, Plaintiff TMS seeks entry of judgment against Defendants Ripani and CharterUP pursuant to the Prayer for Relief set forth below.

**COUNT FOUR**
**Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.***
**(Against All Defendants)**

107.    TMS repeats and realleges each and every allegation contained in the prior paragraphs of this Amended Complaint, as if fully set forth at length herein.

108.    Defendants engaged in a contract, combination, and/or conspiracy in an unreasonable and unlawful restraint on trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq*.

109.    Ripani and Gerrity entered into an agreement by which CharterUP would serve as the sole event transportation and parking management services provider for Tailtiu's customers. To facilitate this agreement and create an illusion of fair competition to its customers, Gerrity

sought bid proposals under false pretenses from TMS and other event transportation and parking management providers competitive with CharterUP, with the plan to send those proposals to CharterUP, thereby undercutting TMS (and likely others) to CharterUP's sole advantage.

110.    Defendants' contract, combination and conspiracy consisted of a continuing agreement, understanding, and concerted action between and among Defendants by which Defendants fixed its proposal prices based on TMS's confidential information and as a result, rigged the bidding process to the detriment of TMS and other competitors. Defendants' conspiracy is a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

111.    Defendants' contract, combination, and conspiracy occurred in, has impacted and continues to impact U.S. interstate commerce.

112.    As a proximate result of Defendants' unlawful conduct, TMS has suffered injury to its business or property. These injuries include, but are not limited to, losing job opportunities that were previously afforded to TMS prior to and absent Defendants' conspiracy. TMS and other competitors have also been deprived of the benefits of free and open competition in the event transportation and parking management services market.

113.    TMS is entitled to treble damages for the Defendants' violations of the Sherman Act alleged herein, and a permanent injunction restraining Defendants from engaging in additional anticompetitive conduct.

**COUNT FIVE**
**Common Law Conversion (Against Ripani and CharterUP)**

114.    TMS repeats and realleges each and every allegation contained in the prior paragraphs of this Amended Complaint, as if fully set forth at length herein.

115.    Ripani and CharterUP physically interfered with TMS's use of its Confidential and Proprietary Information when Ripani obtained TMS's Confidential and Proprietary Information through unauthorized access to TMS's cloud-based systems, with bad faith and intent to use the Confidential and Proprietary Information to the detriment of TMS and to the benefit of CharterUP.

116.    CharterUP continues to utilize TMS's Confidential and Proprietary Information despite receiving TMS's Cease and Desist letters, to the detriment of TMS.

117.    The actions of Ripani and CharterUP, as set forth herein, constitutes conversion of TMS's trade secrets.

118.    As a direct and proximate result of the wrongful conduct of Ripani and CharterUP, TMS has been irreparably injured, has suffered damages exceeding $75,000.00, and will continue to suffer damages.

WHEREFORE, Plaintiff TMS seeks entry of judgment against Defendants Ripani and CharterUP pursuant to the Prayer for Relief set forth below.

### COUNT SIX
**Common Law Conversion (Against Ripani)**

119.    TMS repeats and realleges each and every allegation contained in the prior paragraphs of this Amended Complaint, as if fully set forth at length herein.

120.    Ripani physically interfered with TMS's property (*i.e.* the First Ripani Laptop) when Ripani failed to return the First Ripani Laptop to TMS following TMS's request.

121.    Ripani's actions of retaining TMS's property longer that TMS permitted him to do so, and with disregard to TMS's request otherwise, amounts to a conversion of the First Ripani Laptop.

122.    As a direct and proximate result of the wrongful conduct of Ripani, TMS has been irreparably injured, has suffered damages exceeding $75,000.00, and will continue to suffer damages.

WHEREFORE, Plaintiff TMS seeks entry of judgment against Defendant Ripani pursuant to the Prayer for Relief set forth below.

**<u>COUNT SEVEN</u>**
**Common Law Breach of Fiduciary Duty and Duty of Loyalty (Against Ripani)**

123.    TMS repeats and realleges each and every allegation contained in the prior paragraphs of this Amended Complaint, as if fully set forth at length herein.

124.    As an employee of TMS, Ripani owed TMS a duty of loyalty and was obligated to act with the utmost good faith, and in the best interest of TMS.

125.    TMS was entitled to place its trust and confidence in Ripani, and was entitled to expect him to act with the utmost good faith toward it in carrying out his employment duties and business of TMS.

126.    TMS relied on the loyalty and integrity of Ripani and his faithful performance of his responsibilities.

127.    Ripani took advantage of TMS's faith in him – thereby breaching his fiduciary duties – by acting in conflict with TMS's interest, by engaging in activities for his own benefit and the benefit of CharterUP, to the detriment of TMS, by purposefully withholding the return of the First Ripani Laptop, to wrongfully maintain access to TMS's cloud-based systems after the termination of his employment and, upon information and belief, by providing TMS's Confidential and Proprietary Information to CharterUP and/or using that information in conducting CharterUP's business.

128.    Ripani knowingly and willingly breached his duty of loyalty to TMS by misappropriating TMS's Confidential and Proprietary Information, and engaging in acts that undermined TMS's business operations.

129.    Ripani acted in a manner inconsistent with his agency and trust by misappropriating TMS's Confidential and Proprietary Information to the injury of TMS and for his own benefit and the benefit of CharterUP, and by acting against TMS's interests during and after his employment by TMS.

130.    As a direct and proximate cause of the disloyalty of Ripani and breach of his duties, TMS has been and is being harmed, and faces risk of irreparable harm.

131.    Ripani is still in possession of the First Ripani Laptop and TMS's Confidential and Proprietary Information, continues to access that information, and is able to use that information to benefit CharterUP and to the detriment of TMS.

132.    As a direct and proximate result of the wrongful conduct of Ripani, TMS has been irreparably injured, has suffered damages exceeding $75,000.00, and will continue to suffer damages.

WHEREFORE, Plaintiff TMS seeks entry of judgment against Defendant Ripani pursuant to the Prayer for Relief set forth below.

## COUNT EIGHT
### Common Law Fraud or Deceit (against Ripani)

133.    TMS repeats and realleges each and every allegation contained in the prior paragraphs of this Amended Complaint, as if fully set forth at length herein.

134.    Shortly before his voluntary resignation with TMS, Ripani knowingly lied and falsely asserted that the First Ripani Laptop was inoperable, with the intent to wrongfully obtain

the First Ripani Laptop for the purpose of defrauding TMS into supplying the Second Ripani Laptop and retain possession of the First Ripani Laptop after his resignation.

135.    TMS relied on Ripani's misrepresentations regarding the operability of the First Ripani Laptop in good faith and trusted Ripani that his statements were true and accurate.

136.    Ripani took advantage of TMS's good faith reliance by using the First Laptop after his employment ended to gain unauthorized access to TMS's cloud-based systems with the intent to steal TMS's Confidential and Proprietary Information, which he then used to underbid TMS in contract negotiations with TMS's clients, on behalf of CharterUP.

137.    As a direct and proximate cause of Ripani's misrepresentation, TMS has been irreparably injured and has suffered damages exceeding $75,000.00, and will continue to suffer damages.

WHEREFORE, Plaintiff TMS seeks entry of judgment against Defendant Ripani pursuant to the Prayer for Relief set forth below.

### COUNT NINE
**Tortious Interference with Prospective Business Relations (against All Defendants)**

138.    TMS repeats and realleges each and every allegation contained in the prior paragraphs of this Amended Complaint, as if fully set forth at length herein.

139.    Ripani intentionally and willfully misrepresented the condition of the First Ripani Laptop with the intent to receive the Second Ripani Laptop and retain the First Ripani Laptop following the end of his employment. Following his resignation, Ripani intentionally and willfully used the First Ripani Laptop to access TMS's cloud-based systems repeatedly on at least fifteen (15) occasions – and even after receiving a cease and desist letter from TMS - to steal TMS's Confidential and Proprietary information, which he then used against TMS to underbid TMS in contract negotiations with TMS's clients on behalf of CharterUP.

140. Ripani and Gerrity also intentionally and willfully devised a scheme to solicit proposals from TMS in an effort to undercut TMS and divert business to CharterUP.

141. Ripani's unauthorized access to TMS's cloud-based system and his illegal price-fixing scheme with Gerrity caused damage and loss to TMS, as TMS lost clients it has serviced for years.

142. Ripani was never justified in accessing TMS's cloud-based systems post-resignation or conspiring with Gerrity to rig TMS's bidding process, and did so through false misrepresentations, deceit, and fraud. Charter Up was never justified in using TMS's Confidential and Proprietary Information, fraudulently obtained by Ripani.

143. Ripani's intentional and willful actions of gaining unauthorized access to TMS's software and stealing its proprietary information and conspiring with Gerrity to rig the bidding process for event transportation and parking management services to CharterUP's sole benefit, and Chater Up's intentional and willful actions of using TMS's Confidential and Proprietary Information illegally obtained by Ripani against TMS – even after receiving a cease and desist letter from TMS - constitutes malice.

144. As a direct and proximate cause of Defendants intentional interference with TMS's business, TMS has been irreparably injured, suffered damages exceeding $75,000.00, and will continue to suffer damages.

WHEREFORE, Plaintiff TMS seeks entry of judgment against Defendants pursuant to the Prayer for Relief set forth below.

### COUNT TEN
### Unfair Competition (Against All Defendants)

145. TMS repeats and realleges each and every allegation contained in the prior paragraphs of this Amended Complaint, as if fully set forth at length herein.

146.    Maryland recognizes the common-law tort of unfair competition which covers "all cases of unfair competition in the field of business." *Baltimore Bedding Corp v. Moses*, 182 Md. 229 (1943). "[The] tort of unfair competition is the damaging or jeopardizing [of] another's business by fraud, deceit, trickery or unfair methods of any sort." *Phreesia, Inc. v. Certify Glob., Inc.*, No. DLB-21-678, 2022 U.S. Dist. LEXIS 215683, at *18 (D. Md. Nov. 29, 2022).

147.    Defendants' actions continue to damage and jeopardize TMS through unfair methods, including, but not limited to: (a) misappropriation of TMS's Confidential and Proprietary Information and using that information against TMS in bidding TMS's customers, and (b) obtaining TMS proposals under false pretenses and for the purpose engaging in bid rigging and price fixing to unlawfully restrain trade and harm TMS.

148.    The actions described above were conducted by Defendants through fraud, deceit and trickery, and for the sole purpose of providing Defendants an unfair advantage when competing against TMS.

149.    As a direct and proximate cause of Defendants' unfair methods TMS has been irreparably injured, suffered damages exceeding $75,000.00, and will continue to suffer damages.

## **PRAYER FOR RELIEF**

WHEREFORE, TMS demands judgment against Ripani, CharterUP, Gerrity, and Tailtiu on all Counts of the Amended Complaint that includes the entry of an Order:

A.  For the unlawful conduct alleged herein (and as pleaded in Count Four) to be adjudged and decreed to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act;

B.  Permanently enjoining and retraining Ripani, CharterUP, Gerrity, and Tailtiu, or any of Defendants' subsidiaries, affiliates, successors, transferees, assignees

29

and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf

C.  Permanently enjoining and restraining Ripani, CharterUP, and those persons in active concert and participation with Defendants who receive actual notice of the Court's order by personal service or otherwise, from any implementation, modification, or customization of its business practices or operations, including without limitation its use of TMS's Confidential and Proprietary Information, or any other trade secrets or internal, proprietary, or confidential documents, data, or information of TMS;

D.  Permanently enjoining and restraining Ripani, CharterUP, and those persons in active concert and participation with Defendants who receive actual notice of the Court's order by personal service or otherwise, from the disclosure or use of TMS's Confidential and Proprietary Information or any other trade secrets or internal, proprietary, or confidential documents, data, or information of TMS;

E.  Permanently enjoining and restraining Ripani, CharterUP, and those persons in active concert and participation with Defendants who receive actual notice of the Court's order by personal service or otherwise, from reproducing or otherwise using TMS's Confidential and Proprietary Information, and any and all internal, confidential, proprietary, and/or trade secret documents, data, and/or information belonging to TMS;

F.  Permanently enjoining and restraining Ripani, CharterUP, and those persons in active concert and participation with Defendants who receive actual notice of the Court's order by personal service or otherwise, from viewing TMS's

Confidential and Proprietary Information or any other trade secrets or internal, proprietary, or confidential documents, data, or information of TMS, in his possession which has not yet been viewed by Ripani, CharterUP, or any persons acting on their behalf;

G. Requiring Ripani, CharterUP, and those persons in active concert and participation with Defendants who receive actual notice of the Court's order by personal service or otherwise, to immediately return all records related to TMS in their possession including TMS's Confidential and Proprietary Information, all trade secrets or internal, confidential, or proprietary information, belonging to TMS, and any copies thereof, to TMS, including but not limited to, documents, e-mails, customer lists, spreadsheets, computer files, financial information, and all other information concerning TMS;

H. Requiring Ripani and those persons in active concert and participation with Ripani who receive actual notice of the Court's order by personal service or otherwise, to immediately return all equipment belonging to TMS in their possession, including any computer equipment, in the same condition and working order as when Ripani's employment with TMS ended;

I. Requiring Ripani, CharterUP, and those persons in active concert and participation with Defendants who receive actual notice of the Court's order by personal service or otherwise, to immediately disclose to TMS each person, including individuals and business entities, with whom they have shared TMS's Confidential and Proprietary Information, trade secrets, or data (electronic or

otherwise), including any and all documents, data, or information in their possession, custody, or control;

J. Directing Ripani and those persons in active concert and participation with Ripani who receive actual notice of the Court's order by personal service or otherwise, to preserve Ripani's personal and business computers and electronic storage devices to determine the extent of information and company property that was copied from TMS's computer network(s) and, to that end, order Ripani to (i) refrain from taking any action to destroy, discard, tamper with, or delete any electronic or written communications, documents, materials, and any and all information in Ripani's possession, custody, or control relating to TMS's Confidential and Proprietary Information, all trade secrets or internal, confidential, or proprietary data or information belonging to TMS, and any copies thereof; (ii) take all steps necessary to ensure preservation of all communications in connection with TMS's Confidential and Proprietary Information, all trade secrets or internal, confidential, or data or information belonging to TMS, and any copies thereof, including all electronically formatted or stored documents in Ripani's possession, custody, or control; and (iii) adjust any document retention or destruction policy and all computer backup protocols to ensure that preservation of TMS's Confidential and Proprietary Information, all trade secrets or internal or confidential data or information belonging to TMS, and any copies thereof;

K. Directing Ripani and those persons in active concert and participation with Ripani who receive actual notice of the Court's order by personal service or

otherwise, to allow TMS, or its agent, (i) access to Ripani's business and personal computers and electronic storage devices to determine the extent of information and company property that was copied from TMS's computer network(s) and/or including or related to TMS's Confidential and Proprietary Information, and (ii) the right to copy any such devices at Ripani's expense;

L.  The appointment of a Special Master paid for by Ripani and CharterUP to ensure that no propriety or confidential information belonging to TMS is used by Defendants in the future;

M.  Awarding compensatory, consequential, and punitive damages arising out of Defendants' conduct given that their conduct was intentional, knowing, willful, malicious, fraudulent, and oppressive;

N.  Awarding costs and counsel fees incurred in this action as required;

O.  Ordering expedited discovery; and

P.  Granting such other and further relief as this Court deems equitable and just.

## **Jury Demand**

The Plaintiff hereby demands a jury trial as to all issues triable by a jury.

*/s/ Jennifer L. Curry, Esq.*
Jennifer L. Curry, Esq.

Respectfully submitted,

*/s/ Jennifer L. Curry, Esq.*
Jennifer L. Curry, Esq., Bar No.: 29038
jcurry@bakerdonelson.com
Gillian Felix, Esq., Bar No.: 21717
gfelix@bakerdonelson.com
BAKER,    DONELSON,    BEARMAN,
CALDWELL & BERKOWITZ, P.C.
100 Light Street, 19th Floor
Baltimore, MD 21202
(410) 862 – 1183 (Phone)
(410) 547 – 0699 (Fax)

*Attorneys for Transportation Management Services, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 7th day of August, 2025, the foregoing was served upon all parties through their counsel of record via this Court's CM/ECF system.

*/s/ Jennifer L. Curry, Esq.*
Jennifer L. Curry, Esq.