**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**(BALTIMORE)**

| | |
|---|---|
| TRANSPORTATION MANAGEMENT SERVICES, INC., | § § § |
| Plaintiff, | § § § |
| v. | §  Civil Action No. § § 1:25-cv-00135-ABA |
| ANDREW RIPANI, *et al.*, Defendants. | § § § § § § |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SPOLIATION SANCTIONS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 37(e)**

Plaintiff Transportation Management Services, Inc. ("TMS") respectfully submits this Memorandum of Law in support of its Motion for Spoliation Sanctions pursuant to Fed. R. of Civ. P. 37(e) against Defendants Andrew Ripani ("Ripani") and CharterUP.

**I.      INTRODUCTION**

This case arises from Ripani's disregard for fair competition during and after his employment with TMS—a disregard that now extends to this litigation, as evidenced by his spoliation of crucial text messages.

Despite being on notice that TMS intended to pursue legal claims against them, Ripani and CharterUP failed to take any steps to preserve text messages on Ripani's cell phone. Then in December 2024, one month before litigation was filed, all of Ripani's text messaging data was deleted from his phone. Ripani has admitted that *even after* this litigation was filed, neither he nor CharterUP took steps to preserve text messages, and that some post-filing text messages were deleted, including those with the co-defendant Timothy Gerrity ("Gerrity"). These failures are even

1

more egregious given that Ripani and CharterUP received and reviewed a litigation hold letter sent by TMS.

Ripani blamed the loss of evidence on a switch from SMS to RCS messaging—an explanation that defies technical logic and explanation. For messages to be deleted to the extent that they were rendered unavailable for production, *user input is required*—meaning Ripani must have taken intentional steps to delete the text messages.

TMS has been severely prejudiced by Ripani's actions. Ripani used his cell phone for business at TMS and CharterUP. TMS is now deprived of those communications, which are directly relevant and probative in this matter. In fact, TMS discovered some of the spoliated text messages through third-party subpoenas sent based on TMS's speculation and co-defendant Gerrity's document production. Not surprisingly, that small sample of text messages revealed substantial wrongdoing by Ripani, including the exchange of a commercial bribe. TMS has no doubt that the remainder of Ripani's spoliated text messages would have included additional instances of price fixing, unfair competition, and breaches of Ripani's fiduciary duty to TMS. Without text messages before December 2024, TMS cannot assess the full extent of Ripani's misconduct. Further, Ripani blames much of his alleged misconduct on his wife. Yet both Ripani and his wife have "lost" text messages between them that they contend support Ripani's defense.

It is clear that Ripani acted in bad faith, and thus the imposition of the most serious sanctions under Rule 37(e) are appropriate, including default judgment or an adverse inference instruction, preclusion of text messages as evidence, and preclusion of Bethany Ripani as a witness for the Defendants.

## II.    <u>BACKGROUND</u>

TMS filed this action against Ripani on January 17, 2025, alleging that Ripani—a former Director of Customer Development at TMS—stole confidential and proprietary business information by retaining a company laptop he fraudulently claimed was inoperable. Ripani then used that information to benefit his new employer, CharterUP, in direct competition with TMS. TMS served Requests for Production of Documents on Ripani and CharterUP on May 30, 2025. Then, in its Amended Complaint, filed on August 7, 2025, TMS alleged that Ripani and CharterUP conspired with co-Defendant Timothy Gerrity ("Gerrity") to rig the bidding process for events and customers he formerly serviced at TMS. Amended Complaint ¶¶ 20–75. On August 29, 2025, Ripani and CharterUP provided their written responses and document production in response to TMS's requests. Neither Ripani nor CharterUP produced a single text message. The following chronology details how TMS uncovered Ripani's spoliation of text message evidence central to its claims and summarizes Ripani's key admissions at deposition.[1]

After filing the Amended Complaint, TMS served discovery requests on defendants Tailtiu and Gerrity. In response, Gerrity produced sixty-four pages of communications, consisting primarily of text message communications between Ripani and Gerrity, spanning July 2023 through October 2025.[2] Those texts, ***which Ripani did not produce***, revealed extensive communications concerning

---

[1] Based on these allegations, TMS asserts the following claims against Ripani and CharterUP: (1) Trade Secret Misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1839, *et seq.* (Count One); (2) Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (Count Two); (3) Trade Secret Misappropriation under the Maryland Uniform Trade Secrets Act, Md. Code, Com. Law § 11-1201, *et seq.* (Count Three); (4) Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (Count Four); (5) Common Law Conversion of TMS's confidential and proprietary information (Count Five); (6) Common Law Conversion of the First Ripani Laptop (Count Six); (7) Common Law Breach of Fiduciary Duty and Duty of Loyalty (Count Seven); (8) Common Law Fraud or Deceit (Count Eight); (9) Tortious Interference with Prospective Business Relations (Count Nine); and (10) Unfair Competition (Count Ten). Amended Complaint ¶¶ 76–149.

[2] 2 Notably, this production was made on December 1, 2025—the night before Ripani's deposition.

the 2024 Aftershock and GoldenSky music festivals, including messages in which **Ripani offered Gerrity a bribe** and a message in which Ripani stated, ***"I'm waiting to get served!"*** *See* Excerpts of Ripani and Gerrity Text Messages, attached hereto as **Exhibit 1** at p. 33[3].

TMS also issued third-party subpoenas to former clients and customers it suspected Ripani had contacted on behalf of CharterUP. Those subpoenas yielded additional incriminating communications, including text messages between Ripani and Strada Jannero of Latitude 38 regarding the BottleRock event. Those text messages revealed that Ripani, while still employed by TMS, instructed Ms. Jannero on the proper way to terminate her company's relationship with TMS. *See* Excerpts of Ripani and Jannero Text Messages, attached hereto as **Exhibit 2** at pp. 1-6.

The stark contrast between these third-party productions and Ripani's own discovery responses—***which contained no text messages***—revealed that Ripani was either hiding or had spoliated text message evidence on a massive scale.[4]

At his December 3, 2025 deposition, Ripani admitted his spoliation. Ripani confirmed that he had produced no text messages in this litigation despite routinely using his cell phone for business, testifying that he did "not have any texts" predating December 2024 due to "a switch from SMS messaging to RCS messaging." *See* Excerpts from Ripani's Deposition ("Ripani Dep."), attached hereto as **Exhibit 3**, at 111:10–111:14. He further conceded that he took no action whatsoever to preserve text messages—either before or after receiving TMS's Litigation Hold Letter in October 2024. Ripani Dep. 111:8; 112:6–112:19. The following exchange is representative:

> Q:    You had taken no action to do anything to make sure that these text messages were saved or preserved in any way?
> A:    No.

---

[3] The page numbers referenced for Exhibit 1 refer to the bates numbers in the bottom left hand corner of the documents produced by Gerrity/Tailtiu.
[4] For context, the Tailtiu production confirmed that Ripani exchanged more than 800 text messages with Gerrity between July 22, 2023 and October 28, 2025, none of which Ripani had produced despite precise document requests seeking them.

> Q:     Even though you had received a preservation notice from me about potential claims that would be coming in the **fall of 2024**?
> A:     I didn't touch anything once I got that.
> Q:     But you did not preserve them?
> A:     I did not.

Ripani Dep. 112:9–19. (emphasis added.)

Ripani has admitted that he anticipated litigation as early as February 2024, yet preserved nothing, including messages that were exchanged *after litigation began*. Ripani Dep. 219:6–22; 221:4–16. Ripani conceded that he no longer possessed some post-complaint communications and testified that he had "no idea" how many text messages he had failed to preserve. Ripani Dep. 229:23–24; 230:6–9; 231:13–18. He confirmed that he had no litigation hold on his phone (Ripani Dep. 232:14–17) and that neither he, nor CharterUP, retained a forensic expert to recover lost messages (Ripani Dep. 230:12–17), despite the fact that the parties were 11 months into litigation. Similarly, CharterUP's President, Armir Harris, confirmed that CharterUP, even after receipt of a litigation hold letter and the institution of this litigation, took no steps to collect or preserve Ripani's business text messages. *See* Excerpts of Armir Harris Deposition Part 2 ("Harris Dep. Vol. II"), attached hereto as **Exhibit 4**, at 30-32.

The spoliation extends beyond Ripani alone. Bethany Ripani, Ripani's wife—whose communications with Ripani are central to his defense concerning the retained TMS laptop—confirmed in response to a subpoena that her "text message history recoverable on [her] phone only goes back to July 2024" and that she was "truly hoping to recover earlier messages." *See* Bethany Ripani Subpoena Response, attached hereto as **Exhibit 5**. No such "earlier messages" have since been produced by either Ripani or his wife. In addition, at his deposition Ripani further admitted that he took no action to preserve the information on his wife's phone. Ripani Dep. 145:14–19.

III.    **ARGUMENT**

TMS has been grossly prejudiced by Ripani and CharterUP's failed preservation of relevant evidence that cannot be restored. Those failures occurred *despite Ripani and CharterUP's anticipation of litigation, receipt of timely litigation hold letters, and/or already being involved in this active litigation.*

Rule 37 provides that, upon a showing that a party failed to take steps to preserve potentially relevant information, the Court may order measures "necessary to cure the prejudice," or, upon a showing of intent to deprive another party of the information, may "presume that the lost information was unfavorable to the party; instruct the jury that it may or must presume the information was unfavorable to the party; or dismiss the action or enter a default judgment." *See* Fed. R. Civ. P. 37(e). This authority stems from the Court's inherent right to impose sanctions for spoliation "to preserve the integrity of the judicial process in order to retain confidence that the process works to uncover the truth." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001).

To impose sanctions for spoliation, a showing must be made that (1) the party having control over the evidence had a duty to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind;" and (3) the evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it. *Membreno v. Atlanta Restaurant Partners, LLC*, 338 F.R.D. 66, 71 (D. Md. 2021). The Court may impose sanctions for spoliation where there is any fault, such as bad faith, willfulness, gross negligence, or ordinary negligence. *Turner*, 736 F.3d 274.

6

Here, the evidence establishes that Ripani and CharterUP's spoliation of evidence was done in bad faith as part of a larger effort to deprive TMS of evidence detrimental to Ripani and CharterUP. That spoliation clearly prejudiced TMS's ability to investigate and prosecute its claims. Accordingly, the sanctions requested herein are both appropriate and necessary to address the spoliation of evidence and to deter similar conduct in the future.

### A. Ripani and CharterUP Engaged in Sanctionable Misconduct by Spoliating Evidence After Their Duty to Preserve Relevant Materials Arose.

To obtain spoliation sanctions, the movant must show the spoliator had a duty to preserve material evidence. *Turner*, 736 F.3d at 282. It is "well settled that a party has a duty to preserve evidence when the party is placed on notice that the evidence is relevant to the litigation or when the party should have known that the evidence may be relevant to future litigation." *Powell v. Town of Sharpsburg*, 591 F. Supp. 2d 814, 818-819 (E.D.N.C. 2008) (quoting *Eckhardt v. Bank of Am., N.A.*, 2008 WL 1995310, at *5 (W.D.N.C. 2008)). This duty arises "not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Silvestri*, 271 F.3d at 591. Once a party reasonably anticipates litigation, it must implement a "litigation hold" to ensure potentially relevant evidence is identified, located, and preserved. *Goodman v. Praxair Servs., Inc.,* 632 F. Supp. 2d 494, 511 (D. Md. 2009); *see also First Mariner Bank v. Resolution Law Grp., P.C.*, No. MJG-12-1133, 2014 WL 1652550, at *8 (D. Md. Apr. 22, 2014).

In addition, "District courts within the Fourth Circuit have concluded that 'the receipt of a demand letter, a request for evidence preservation, a threat of litigation, or a decision to pursue a claim will all trigger the duty to preserve evidence.'" *Jennings v. Frostburg State Univ.*, 679 F. Supp. 3d 240, 292 (D. Md. 2023) (*quoting Steves & Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96, 106 (E.D. Va. 2018)).

7

1. **Ripani Anticipated Litigation as Early as February 2024.  As of July 2024, He Was "Waiting to be Served."**

Ripani admitted at deposition that he anticipated that litigation with CharterUP was possible in late Winter, early Spring 2024:

- "I was getting threats from TMS from the moment that I left [February 2024] they were going to sue me, and I was getting back channeled messages through former colleagues where they said they were going to sue." Ripani Dep. 156:23–157:2.

- When asked "when did you first get a threat from TMS about litigation," Ripani answered "[b]efore I left the company"—which was February 2, 2024. Ripani Dep. 158:14–17.

- Ripani confirmed that he received threats of litigation before his employment ended and in the "early months" of his CharterUP employment. Ripani Dep. 212:1–9.

- Ripani stated that Tony Glibkowski, on instruction of Mike Moulton[5], told him, "Mike says you better stop what you're doing, they're going to sue you." Ripani Dep. 212:20–21. Ripani confirmed that this occurred "several times" and noted that "I know in June [2024] it happened." Ripani Dep. 213:10–11.

- Ripani heard from Ryan Schaap in June 2024 that "I would be sued if I worked that account [Aftershock]." Ripani Dep. 213:2–6.

- Mike Medvin told Ripani on or before April 2024 that "they're going to sue you." Ripani Dep. 216:8–19; 217:11–17.

---

[5] Mike Moulton is TMS's President.

Ripani's admissions confirm he anticipated litigation throughout 2024, and his texts with Gerrity—obtained only through Gerrity's production—corroborate this. On April 22, 2024, Ripani texted Gerrity:

> I'm treading gently, as beating up on TMS from me could potentially be annoying if they decided to try and sue me.

*See* Ex. 1**,** p. 26. Then, on July 22, 2024, Ripani stated:

> **I'm waiting to get served! 'BRING IT'**

*See* Ex. 1, p. 34. (emphasis added). Then, on August 7, 2024, Ripani stated:

> …. [I] thought TMS is trying to serve him thru me or something. FUCK TMS

Ex. 1, p.1.

Simply put, based on his own words, Ripani anticipated litigation with TMS long before he "lost" his text messages in December 2024.

### 2.    Ripani and CharterUP Received Litigation Hold and Cease-and-Desist Letters in September and October 2024.

On September 6, 2024, TMS sent a cease-and-desist letter to CharterUP relating to Ripani's unlawful actions. *See* **Exhibit 6**. Similarly, on September 17, 2024, Mr. Moulton sent Ripani a cease-and-desist email to Andrew.Ripani@gmail.com. *Id.* Then, on October 16, 2024, TMS, through counsel, sent "Notice[s] to Preserve Evidence Relating to Andrew Ripani's Employment and Claims of Transportation Management Services" ("Litigation Hold Letter") to both Ripani and CharterUP. *Id.*

Ripani and Harris both admitted to reviewing the Litigation Hold Letters after service was completed. *See* Excerpts of Harris Deposition. Vol I, ("Harris Dep. Vol. I") **Exhibit 7**, 218-221; Ripani Dep. 141-143.

### 3. Ripani and CharterUP Did Nothing to Preserve His Text Messages. They Were Deleted in December 2024.

Ripani has admitted that he did nothing to preserve his text messages despite being aware of potential litigation throughout 2024. At his deposition he testified:

Q: Did you do anything to preserve that text message, those text messages, or any other text messages that you've had with anyone related to your employment and the potential claims in this case after you were notified in at least February [2024] that TMS was thinking about suing you?

A: Yeah — no. …

Ripani Dep. 221:4–11.

Q:  Had you done anything before this event occurred to preserve these text messages?

A: No.

Q: You had taken no action to do anything to make sure that these text messages were saved or preserved in any way?

A: No.

Q: Even though you had received a preservation notice from me about potential claims that would be coming in the fall of 2024?

A: I didn't touch anything once I got that.

Q: But you did not preserve them?

A: I did not.

Ripani Dep. 112:6–19. And, despite relying on his wife's actions in this case as a defense,[6] Mr. Ripani admitted:

Q: Did you take any action to preserve the information in her phone when she received notice of this lawsuit as it relates to communications between the two of you about these laptops?

---

[6] Mr. Ripani relies on the fact that he asked his wife to return both laptops (Ripani Dep. 135, 143); that he did not access the computer, instead, she used the laptops for streaming (Ripani Dep. 137-140); and that she discovered when it was locked (Ripani Dep. 172).

10

> A:      Did not. Did not preserve. Did not touch was the goal.

Ripani Dep. 145:14–19. Then, Mr. Ripani explained that in December 2024 he lost all of his previous text messages:

> Q:      You haven't produced these text messages in the course of discovery, have you?
>
> A:      I have not. I do not have any texts after December [2024[7]] from a switch from SMS messaging to RCS messaging.

Ripani Dep. 111:10–14.

Ripani, under oath, explained that "[t]hat's when the change happened and then I lost all of the text messages that were before that." Ripani Dep. 111:25–112:2; *see also id.,* 141 (confirming he lost all text messages in December 2024). Ripani later *doubled down* on his explanation that the loss was due to a switch from SMS to RCS messaging.

> Q:      …So, Mr. Ripani, you said you lost all of your text message data in December 2024, correct?
>
> A:      Before that I did not access it.  It switched from SMS to RCS, and I don't know where it is. I don't know.

Ripani Dep. 227:20–25.

### 4.      Ripani and CharterUP Did Not Preserve Text Messages *After This Litigation Was Filed.*

Perhaps most astonishing, Ripani admitted that a litigation hold was not implemented on his cell phone and text messages were deleted ***after the filing of this lawsuit***.[8] During his deposition, Ripani was confronted with a text message from February 2025 between him and co-defendant

---

[7] After initially claiming the loss occurred in December 2023, Ripani later clarified that the switch from SMS to RCS occurred in December 2024. Ripani Dep. 111.

[8] TMS served Mr. Ripani with the Complaint on January 17, 2025. TMS served CharterUp on January 24, 2025. Both Mr. Ripani and CharterUp have been represented throughout this litigation. Simply put, their refusal to implement litigation holds and loss of evidence is inexcusable.

Gerrity[9] discussing the contents of his affidavit and whether Gerrity was comfortable with Ripani's assertions, which he had not produced. When asked why he didn't produce it, Mr. Ripani testified:

A:     **I don't know where the text message is**. I did not --- no, I did not…..

Q:     … you didn't produce these text messages, did you?

A:     Correct. I don't know where it was.

Q:     Did you search for them?

A:     I did, yes.

Q:     Did you identify an expert to help you search for responsive documents?

A:     I did not.

Ripani Dep. 229:25–230:14 (emphasis added).

When confronted with other non-produced and relevant text messages with Gerrity from August 2025, Ripani confirmed that text messages were *deleted months into this litigation*:

Q:     You didn't produce these text messages either.

A:     No. But that was exactly when I was managing three mega events and was getting a thousand texts a day, **so things were getting deleted**. They were happening. It wasn't intentional. But I would think that would be something I would want to include….

Q:     So how many more text messages do you think you have failed to produce in this case since you received the request for production of documents in March of 2025?

A:     **I have no idea…**

Q:      Could they have been lost?

A:     Yes.

Q:     **Do you have any kind of hold on your phone right now to preserve documents and information?**

A:     **No, I don't even know what I would use.**

---

[9] TMS only received this text message through Gerrity's document production.

12

Q:      But you just said you could have lost text messages with Mr. Gerrity?

A:      Yes.  Accidentally, yes, for sure…

Ripani Dep. 231:6–18; 232:12–21 (emphasis added).

In short, the evidence overwhelmingly satisfies the first element of a spoliation sanction: Ripani and CharterUP had an obligation to preserve evidence which was subsequently deleted.

### B.      The Defendants Acted in Bad Faith by Intentionally Destroying Relevant Evidence to the Prejudice of Plaintiff.

The second element that TMS must prove is culpability. "In the Fourth Circuit, for a court to impose some form of sanctions for spoliation, any fault—be it bad faith, willfulness, gross negligence, or ordinary negligence—is a sufficiently culpable mindset." *Turner,* 736 F.3d 274 (*citing Victor Stanley, Inc. v. Creative Pipe, Inc*., 269 F.R.D. 497, 529 (D. Md. 2010)). In the context of spoliation, ordinary negligence is the failure to identify, locate, and preserve evidence, where a reasonably prudent person acting under like circumstances would have done so. *See In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig*., 299 F.R.D. 502, 519 (S.D. W. Va. 2014). The finding of gross negligence requires a similar showing as ordinary negligence, but to a greater degree. *Id*. Willfulness and bad faith will only be found where a party has engaged in "intentional, purposeful, or deliberate conduct." *Id*. (*quoting Victor Stanley*, 269 F.R.D. at 529). While bad faith requires the destruction of evidence "for the purpose of depriving the adversary of the evidence," *Goodman,* 632 F. Supp. 2d at 520, willfulness only requires a demonstration of intentional or deliberate conduct resulting in spoliation. *Buckley v. Mukasey*, 538 F.3d 306, 323 (4th Cir. 2008).

Bad faith destruction of evidence occurs when a party intentionally destroys documents after its duty to preserve arose and it had knowledge of the filing of a lawsuit. *See, e.g.*, *Victor Stanley,* 269 F.R.D. at 531 (finding bad faith where party intentionally destroyed evidence when they were aware of the lawsuit); *see also Powell*, 591 F. Supp. 2d at 820. "[I]f the record shows that a party

destroyed or materially altered documents or materials in bad faith, that establishes, without more, that the destroyed documents or materials were relevant." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 803 F. Supp. 2d 469, 499 (E.D. Va. 2011).

Here, the evidence proves that Ripani's and CharterUP's actions were willful and in bad faith. "[B]ad faith may be inferred by evidence that a party has misrepresented the existence of documents or allowed the destruction of documents, and had explanations of spoliation that were not credible." *Disedare v. Brumfield*, No. CV 22-2680, 2024 WL 1526699, at *12 (E.D. La. Apr. 9, 2024). In fact, a "'strong chain of circumstantial evidence' may be sufficient to establish bad faith." *Id.*

> However, because intent 'rarely is proved by direct evidence,' a court imposing spoliation sanctions 'has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witness in a particular case, and other factors. But there must be evidence of 'a serious and specific sort of culpability' regarding the loss of the relevant ESI.

Great Am. Ins. Co. v. Twin Cities Dance & Entm't Co., LLC, No. 23-CV-767 (NEB/SGE), 2025 WL 1754485, at *7 (D. Minn. Mar. 5, 2025), *report and recommendation adopted sub nom. Great Am. Ins. Co. v. Twin Cities Dance & Entm't, LLC,* No. 23-CV-767 (NEB/SGE), 2025 WL 1772802 (D. Minn. June 27, 2025)*; citing Kelley as Tr. of BMO Litig. Tr. v. BMO Harris Bank N.A*., 657 B.R. 475, 484 (D. Minn. 2022*)* (quoting *Morris v. Union Pac. R.R.*, 373 F.3d 896, 901 (8th Cir. 2004)).

In *Victor Stanley*, the Court, finding bad faith, noted that, "the spoliating parties lied about their ESI production; obstructed the discovery process; and intentionally destroyed evidence when they were aware of the lawsuit." *Id.* Here, Ripani and CharterUP's conduct presents similar circumstances that justify the finding of bad faith. Ripani and CharterUP have obstructed the

14

discovery process, presented a non-credible explanation of spoliation, deleted evidence after this litigation was filed, and failed to take any action to rectify their spoliation.

      1.      **Ripani's Justification for the Deletion of His Text Messages Is Not Credible—or Even Plausible. Deletion of Text Messages Requires <u>Intentional User Input</u>.**

Ripani's sole explanation for the destruction of relevant text messages—that his phone "switched from SMS to RCS" and the messages vanished—is both uncorroborated and technically impossible. *See* Declaration of Warren Kruse, attached hereto as **Exhibit 8** ("Kruse Decl."). The SMS-to-RCS[10] protocol transition does not cause deletion of previously stored text messages. Kruse Decl. ¶ 9. That is because both forms of messaging, SMS and RCS, utilize the same database which is not modified when switching between the two messaging formats. Kruse Decl. ¶¶ 9, 23. In other words, both SMS and RCS messages are stored in the same local database and coexist within the same conversation history. Kruse Decl. ¶¶ 18–20. The protocol switch "does not overwrite, delete, or migrate existing stored messages." Kruse Decl. ¶ 22. No documentation or forensic literature supports the proposition that RCS activation causes retroactive deletion of messages. Kruse Decl. ¶ 24.

As Mr. Kruse explains, permanent message loss requires an affirmative user act—deletion, a factory reset, or permanent device damage—combined with the absence of any backup.[11] Kruse Decl. ¶¶ 25, 34. Messages do not spontaneously disappear from a SQLite database because a phone begins negotiating RCS instead of SMS. Kruse Decl. ¶ 21. **Something—or someone—had to delete them.**

---

[10] SMS refers to Short Message Service.  RCS stands for Rich Communication Services.
[11] Ripani still has the same phone. Ripani Dep. 224-225. Further, Ripani does not claim any of these secondary events have occurred.

Mr. Kruse's expert opinion confirms what common sense already suggests: Ripani's explanation is a fabrication, and the deletion of these messages was the product of deliberate user action. *See, e.g. Goldstein v. Denner,* 310 A.3d 548, 588 (Del. Ch. 2024) (Court found that spoliators' implausible explanations for lost text messages supported culpability finding where they "lost their texts through inexplicable failures of their phones to back up their texts from the cloud," and  where "[n]o one has suggested that [they] lost other data from their phones," "[n]either have described emotionally crushing losses of beloved family photos," and "[t]he strange failure to transfer data to their new phones seems only to have affected their texts").

### 2.    Ripani's Bad Faith Is Reflected in His Own Admissions.

The Court need not speculate about Ripani's motivations to hide evidence of his misconduct from TMS—he expressed them in texts to co-defendant Gerrity, after promising him a $1,000 bonus if he could get a verbal commitment on the Aftershock event:

**"Hopefully TMS does not have Spyware on this."**

Ex. 1, p 33. (emphasis added). Ripani's text messages also reveal him expressing hostility toward TMS, stating, "FUCK TMS,"  and, "[G]od i despise TMS." *Id.* at pp 1 and 56.

In short, Ripani's own words—his expressed fear that TMS might have "spyware" monitoring his communications, coupled with his undisguised contempt for TMS, constitute direct evidence that his deletion of text messages was not inadvertent, but a calculated effort to conceal evidence of his misconduct from TMS and this Court.

### 3.    Ripani's Bad Faith Is Reflected by the Fact That He Deleted Text Messages *Eight Months into This Litigation.*

The *timing* of Ripani's message destruction is as damning as the act itself. Ripani does not deny that relevant text messages continued to disappear from his device well into 2025—months after TMS filed this lawsuit and long after his duty to preserve arose.

16

Further, the deletion occurred after Ripani and CharterUP reviewed the cease-and-desist and Litigation Hold Letters after being served with the lawsuit in January 2025. Ripani Dep. 222; 143:19–23; Harris Dep. Vol. I 218-221.

To be clear, the Litigation Hold Letters sent on October 16, 2024, expressly demanded that Ripani and CharterUP preserve "all text messaging, telephone logs, instant messaging, Slack, Trello, GoTo Connect, Microsoft Teams, or any other office messaging systems or applications, as well as Facebook, direct messaging, and other methods of communications." The Litigation Hold Letters further demanded preservation of "[a]ny and all files, documents, communications and ESI evidencing every communication, from the date of termination of your TMS employment to present, you have had with any entity who was a TMS client during the course of your TMS employment."

Ripani further testified that his prior attorneys "did provide something in writing" instructing him to preserve. Ripani Dep. 224:16–19. They knew. And yet, neither Ripani nor CharterUP took action, employed tools, or retained experts to preserve evidence—and then, eight months into this litigation, relevant messages continued to vanish. Ripani Dep. 112:6–12, 219:7–22, 230:12–17.

This is not inadvertence. These are sophisticated parties who knew they were obligated to preserve evidence, who were told repeatedly to preserve evidence, and who nonetheless allowed relevant text messages to be destroyed on a rolling basis throughout the pendency of this litigation. The Court should not permit that gambit to succeed.

Furthermore, Courts across the country have recognized that deletion *during the course of litigation* automatically implicates a higher level of culpability. This Court has held:

> Occurrence of the act of destruction after litigation has begun makes the imposition of sanctions especially appropriate…

*White v. Office of the Pub. Def. for the State of Md.*, 170 F.R.D. 138, 148 (D. Md. 1997).

Similarly, in *Victor Stanley, Inc.*, 269 F.R.D. at 531, this Court, making a finding of bad faith, noted that "the volume and timing" were significant because the spoliators knew of the lawsuit. Other courts agree, reasoning that "[i]n determining bad faith or serious culpability regarding the destruction of evidence, timing of when the destruction occurred may bear on whether a finding of bad faith is required. When evidence is destroyed after litigation has commenced, most cases state that no explicit finding of bad faith is required." *In re Petters Co., Inc.*, 606 B.R. 803, 828 (Bankr. D. Minn. 2019); *E\*TRADE Sec. LLC v. Deutsche Bank AG*, 230 F.R.D. 582, 589 (D. Minn. 2005) ("If, however, the destruction of evidence occurs after litigation is imminent or has begun, no bad faith need be shown by the moving party.").

Similarly, Ripani deleted text messages ***after*** receiving TMS's discovery requests expressly seeking them. *RG Abrams Ins. v. Law Offices of C.R. Abrams*, 342 F.R.D. 461, 514 (C.D. Cal. 2022) ("the timing of the spoliation of Abrams's text messages after being served the Complaint *and* requests expressly seeking them…lead the undersigned to conclude that their conduct is not only willful, in bad faith, and at fault, but resoundingly coordinated").

Furthermore, during Ripani's deposition, he admitted that he possessed texts on his phone from 2025 with Gerrity that were not relevant to this matter, but, unsurprisingly, he did not possess those that were relevant to this case. Ripani Dep. 225:11-25. This Court should not credit such an implausible, self-serving assertion. Rather, that testimony proves that Ripani selectively preserved messages while deleting others. "[C]ourts ha[ve] concluded that the failure to preserve some types of ESI while destroying others is a reasonable basis to infer that the destroying party acted with bad faith." *Paisley Park Enterprises, Inc. v. Boxill*, 330 F.R.D. 226, 235 (D. Minn. 2019*); see also Stevenson v. Union Pac. R. Co.*, 354 F.3d 739, 748 (8th Cir. 2004) (upholding adverse inference instruction where the circumstances demonstrating the destruction of one type of evidence while

18

preserving a different type, created an inference of intent to destroy); *see also Great Am. Ins. Co.*, 2025 WL 1754485, at *8.

>    **4.    Ripani and CharterUP Have Not Taken Action to Rectify His Spoliation and Was Not Forthcoming—Until He Was Caught.**

CharterUP and Ripani's bad faith is also apparent in their attempts to cover up their spoliation through their written discovery responses.[12]

TMS propounded the following Interrogatory, and CharterUP answered under oath stating that there were no communications between their employees (including Mr. Ripani) and Timothy Gerrity:

>    **Interrogatory No. 9:** Identify and describe in detail each and every communication, whether written, recorded, electronic or oral, including all emails and text messages that any employee or agent of Charter Up had and/or exchanged with Timothy Gerrity, Eric Carroll, and/or any employee of TailTiu Events from September 1, 2023 to present, concerning, relating or referring to the 2024 and 2025 Aftershock Music Festival.
>
>    **RESPONSE:** None.

*See* CharterUP Answers to Interrogatories, attached hereto as **Exhibit 9**. [13]

This is a shameless misrepresentation—made even more egregious when it was later revealed to be false based on information clearly within CharterUP's possession, custody, and control.

Mr. Ripani responded to a similar Interrogatory under oath as follows:

>    **Interrogatory No. 10:** Identify and describe in detail each and every communication, whether written, recorded, electronic or oral, including all emails and text messages that you have had and/or exchanged with Timothy Gerrity, Eric Carroll, and/or any employee of TailTiu Events from September 1, 2023 to present, concerning, relating or referring to the 2024 and 2025 Aftershock Music Festival.

---

[12] TMS served Requests for Production of Documents on Ripani and CharterUP on May 30, 2025. On August 29, 2025, Ripani and CharterUP provided their written responses.

[13] For the sake of completeness, CharterUp did list a series of boilerplate objections.

> **RESPONSE:** Subject to and without waiving the foregoing objections, Defendant states that given the volume of interactions Defendant does not recall each and every communication that may have occurred.

*See* Ripani Answers to Interrogatories, attached hereto as **Exhibit 10**. It is both highly convenient and unlikely that Ripani did not recall his text message offering Gerrity a bribe in exchange for TMS's proposal and recommendation to DWP related to the Aftershock Music Festival. *See* Ex. 1, p. 33 ("If I can get a verbal on AS.").

Further, CharterUP's Answer to Interrogatory No. 12 fails to identify and describe Ripani's texts to Ms. Jannero instructing her on the proper way to end her relationship with TMS—sent while he was still employed with TMS. *See* Ex. 9; *cf* Ex. 2. Rather, it only identified communications with Ms. Jannero that are *helpful* to its defense–further evidencing CharterUP's bad faith. *De Los Santos v. Johnson & Johnson*, No. 2:21-CV-01208-LSC, 2024 WL 3700205, at *6 (N.D. Ala. Aug. 7, 2024) (Court found that plaintiff's conduct implies bad faith based, in part, on plaintiff's "materially incomplete or misleading discovery responses").

In sum, in their Answers to Interrogatories both Ripani and CharterUP provided misleading omissions under oath regarding Ripani's text messages.

The evidence of bad faith goes beyond misrepresentations. Even assuming Ripani's far-fetched justification to be true (that he lost his text messages in December 2024), he and CharterUP owed a duty of candor to this tribunal and to TMS to disclose the loss of text message data in response to numerous Interrogatories and Requests for Production seeking those communications. However, both CharterUP and Ripani *were silent* on the issue. In other words, they concealed Ripani's spoliation.

### C.    The Destroyed Text Messages Are Relevant to TMS's Claims, and the Spoliation Has Prejudiced TMS.

To establish prejudice, TMS must demonstrate that the destroyed evidence was "relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence. *Membreno,* 338 F.R.D. at 71. Although the moving party "cannot be expected to demonstrate with certainty the content" of the lost evidence, the moving party must demonstrate a likelihood that the lost evidence would have been favorable to the moving party's case. *Johns v. Gwinn*, 503 F. Supp. 3d 452, 470–71 (W.D. Va. 2020). There are two main categories of spoliated text messages that were relevant to TMS's claims: (1) Ripani's text messages related to his business dealings during the end of his employment with TMS and during his employment with CharterUP; and (2) Ripani's text messages with his wife related to the end of his employment with TMS, his employment with CharterUP, the return of the laptop, and her alleged use of the subject laptop.

### 1.    TMS Is Prejudiced by Being Deprived of Ripani's Text Messages Related to His Business Dealings.

TMS's claims rest on Ripani's unfair competition— and that conduct was primarily carried out through personal communications that are now unavailable. Thus, the destruction of Ripani's text messages inflicts irreparable prejudice that no alternative discovery can cure.

Throughout his tenure as Director of Customer Development at TMS, Ripani's primary job duties included generating, cultivating, and maintaining new business for TMS, which encompassed the high-profile entertainment space such as concerts, festivals, and sporting events. By virtue of his position, Ripani was in routine contact—by phone and by text message—with the very clients, event organizers, and business associates whose relationships he would later exploit for the benefit of CharterUP.

21

Text messages sent and received on Ripani's personal phone were a primary medium through which Ripani coordinated these activities with business colleagues, prospective clients, and co-conspirators. As an example, Ripani recalled receiving "a thousand texts a day" related to "mega events" he was working for CharterUP. Ripani Dep. 231:6–8. [14] In that regard, Ripani admitted that he had "no idea" how many relevant text messages were not produced due to his spoliation. Ripani Dep. 231:18.

However, given the fact that Ripani historically used his phone for business, and based on the communications already received from other sources, it is certain that these spoliated messages would have revealed troves of relevant evidence, which likely would have revealed, among other things: (1) which TMS clients and business associates Ripani contacted or solicited on behalf of CharterUP; (2) whether Ripani shared TMS's Confidential and Proprietary Information—including pricing models, customer lists, and marketing strategies—with third parties via text; (3) the timing and substance of Ripani's communications with others in furtherance of his bid-rigging scheme with Gerrity; (4) the full universe of customers and events that Ripani targeted, not merely those TMS has been able to identify through limited alternative means; and (5) whether Ripani solicited or diverted additional TMS customers to CharterUP beyond the Aftershock, GoldenSky, and Rolling Loud events that TMS was fortunate enough to discover through other means.

TMS's prejudice is structural: it cannot discover what it does not know. TMS attempted to mitigate the loss by issuing third-party subpoenas, but those efforts are inherently limited to entities TMS already knows it lost business to. Even so, those "shots in the dark" subpoenas revealed evidence of severe misconduct by Ripani and CharterUP. *See Cap. Senior Living, Inc. v. Barnhiser*,

---

[14] Ripani sent more than 800 text messages to Timothy Gerrity, a business associate and co-defendant, from July 22, 2023 to October 28, 2025. *See, e.g.,* Ex.1. He also communicated with Strada Jannero of Latitude 38 through text message regarding the BottleRock event. *See* Ex. 2.

713 F.Supp.3d 407, 417 (N.D. Ohio 2024) (finding relevance of spoliated text messages where surviving messages showed a pattern of solicitation, and concluding "it is reasonable to infer that at least some of the destroyed messages would have contained similar content").

In short, TMS has been relegated to proving only the tip of the iceberg. The subpoenas TMS has been able to serve are limited by the very information asymmetry that Ripani's spoliation created. TMS can only pursue the leads it already has; it cannot discover the leads that were destroyed along with Ripani's text messages. The spoliated text message evidence would have laid bare the full breadth of Ripani and CharterUP's unfair competitive acts.

### 2.    TMS Is Prejudiced by Being Deprived of Ripani's Text Messages with His Wife in 2024.

The destruction of text messages between Ripani and his wife, Bethany Ripani, substantially prejudices TMS's prosecution of its claims because those communications constituted the only independent evidence by which TMS could verify or refute Ripani's self-serving account of events surrounding the TMS laptop.

Ripani has placed his communications with Bethany at the very center of his defense—relying on them to establish that he instructed her to return both laptops, that the laptop remaining in his home was used exclusively for streaming, and that he only learned it was disabled when Bethany called him while he was at a conference in November 2024. Yet neither Ripani nor his wife can produce a single text message to corroborate any of these critical assertions.

Ripani's reliance on his communications with Bethany is pervasive and specific. First, regarding his alleged instruction to return TMS's equipment, Ripani testified at deposition, "I probably would have copied and pasted it and sent it to her, but I don't think I was able to find it," and when asked how, he answered, "Either via text, which probably would have made sense, but I could not find it. I looked. I could not find it." Ripani Dep. 141:1–7.

23

When asked what the text would have contained, Ripani testified: "No, but it would have just been 'send computers back to this address.'" Ripani Dep. 144:24–25. His interrogatory responses repeat this narrative under oath, stating that he "asked his wife Bethany Ripani to return two laptops stored in the home hallway to Chris Hall of TMS at 21116 Moonlight Bay, Flower Mound, TX 75022." *See* Ex. 10**,** Answer 6.

Second, regarding his claim that the laptop was used exclusively for streaming, Ripani testified that his wife used the laptop "to stream shows" and that "[s]he would hook it up to a TV via an HDMI cord." Ripani Dep. 63:24–64:1. When asked whether he and his wife continued to use the laptop, Ripani responded, "[t]o watch movies, yes." Ripani Dep. 161:14.

Third, there are undoubtedly communications between Ripani and his wife regarding his employment at CharterUP, his employment at TMS, and the threats of lawsuit that Ripani was allegedly receiving.[15] All of that evidence would be directly relevant because they would represent contemporaneous communications to substantiate, or more likely, refute Ripani's version of events.

Because the text messages no longer exist, TMS has been permanently denied the only independent evidence that could have corroborated or contradicted Ripani's account. The prejudice is compounded by the fact that Ripani admitted he took no action whatsoever to preserve the communications on Bethany's phone:

Q:    Did you take any action to preserve the information in her phone when she received notice of this lawsuit as it relates to communications between the two of you about these laptops?

A.     Did not. Did not preserve. Did not touch was the goal."

---

[15] Notably, both Ripani and his wife testified at length regarding the substance of their communications during their respective depositions. Their counsel failed to object on the grounds of privilege. Mrs. Ripani also produced limited text messages (after July 2024) between her and Ripani. Thus, any claim of "confidential marital communications" privilege has been irrevocably waived.

Ripani Dep. 145:14–19.

In short, TMS is left with nothing more than Ripani's own self-serving testimony to evaluate whether he actually instructed his wife to return both laptops, whether the laptop was truly used only for streaming, and whether Bethany's call in November 2024 was truly the first time either of them recognized the laptop had been locked out. TMS cannot cross-examine on a text message that no longer exists, and it cannot impeach Ripani's account without the very evidence he failed to preserve.

### D.      Default Judgment Is Appropriate

Courts may order a default judgment or dismissal to "send a strong message to other litigants, who scheme to abuse the discovery process and lie to the Court, that this behavior will not be tolerated and will be severely sanctioned." *Krumwiede v. Brighton Assocs., LLC*, No. 05 C 3003, 2006 WL 1308629, at *11 (N.D. Ill. May 8, 2006). In the Fourth Circuit, to order these harshest sanctions, the court must "'be able to conclude either (1) that the spoliator's conduct was so egregious as to amount to a forfeiture of his claim, or (2) that the effect of the spoliator's conduct was so prejudicial that it substantially denied the [plaintiff] the ability to [prosecute] the claim.'" *Goodman*, 632 F. Supp. 2d at 519 (quoting *Sampson v. City of Cambridge, Md.*, 251 F.R.D. 172, 180 (D. Md. 2008) (quoting *Silvestri*, 271 F.3d at 593)).

To conclude that the second prong is met, "the Court must examine the record that remains to determine whether it contain[ed] enough data" for the aggrieved party to build its case or defense, and "the Court must decide whether a lesser sanction than dismissal [or default judgment] would level the playing field." *Erie Ins. Exch. v. Davenport Insulation, Inc.*, 659 F. Supp. 2d 701, 707 (D. Md. 2009); *see Sampson*, 251 F.R.D. at 180; *Victor Stanley,* 269 F.R.D. at 534–35, *aff'd in part, modified in part*, No. CV MJG-06-2662, 2010 WL 11747756 (D. Md. Nov. 1, 2010). Both prongs of the *Silvestri* test are satisfied here, and default judgment is the appropriate sanction.

The combination of fabricated justifications, continued destruction of evidence during litigation, concealment in sworn discovery responses, and deliberate failure to preserve the very communications upon which Ripani relies amounts to conduct so egregious that it forfeits his right to defend this action on the merits.

TMS now lacks the data necessary to prove the full scope and breadth of Ripani and CharterUP's misconduct. The text messages Ripani destroyed were the primary medium through which he coordinated his unfair competitive activities—including communications with clients, prospective customers, co-defendant Gerrity, and his wife. The few messages TMS recovered through third-party subpoenas revealed a bribe offer, bid-rigging coordination, and Ripani's active sabotage of TMS's client relationships during his employment. As this Court has recognized, the measure of prejudice is the difference between what TMS can prove and what Ripani's text messages would have revealed—and that difference is unknown precisely because Ripani destroyed the evidence. No lesser sanction would adequately level the playing field. An adverse inference instruction would not restore TMS's ability to discover what it does not know—namely, the full universe of clients and business relationships that Ripani exploited. Preclusion of evidence would not cure the prejudice of evidence that no longer exists. Monetary sanctions would do nothing to repair the informational asymmetry Ripani has created. Only a default judgment would place TMS in the position it would have occupied had Ripani honored his preservation obligations, and only a default judgment would send the message that this Court will not reward a litigant's deliberate destruction of evidence with the very benefit that the destruction was designed to achieve.

E.    **In the Alternative, an Adverse Inference Instruction Is Appropriate**

If the Court declines to enter default judgment, it should, at minimum, impose an adverse inference instruction as an alternative sanction. In this Circuit, to impose an adverse jury instruction,

the court "must only find that the spoliator acted willfully in the destruction of evidence." *Goodman*, 632 F. Supp. 2d at 519 (citing *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148 (4th Cir. 1995)). The court may instruct the jury that "certain facts are deemed admitted and must be accepted as true"; impose a mandatory, yet rebuttable, presumption; or "permit[ ] (but … not require) a jury to presume that the lost evidence is both relevant and favorable to the innocent party." *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d 456, 470–71 (S.D.N.Y. 2010). The court must also consider relevance and prejudice. *Vodusek*, 71 F.3d at 156 ("To draw an adverse inference from the absence, loss or destruction of evidence, it would have to appear that the evidence would have been relevant to an issue at trial and otherwise would naturally have been introduced into evidence."); *see Victor Stanley*, 269 F.R.D. at 535–36. Each prerequisite for an adverse inference instruction is satisfied here.

For the reasons set forth above, the record establishes that Ripani's actions were willful and deprived TMS of relevant evidence to prosecute its claims. Thus, at a minimum, the Court should impose a permissive inference instruction permitting the jury to presume the destroyed evidence was "both relevant and favorable to the innocent party." *Pension Comm.*, 685 F. Supp. 2d at 470–71. Such an instruction is the only means of restoring a measure of fairness to a trial that Ripani has otherwise tainted through his deliberate destruction of evidence.

> **1.  If the Court Allows This Case to Proceed, Evidentiary Sanctions are Required to Cure the Prejudice Caused by the Spoliation.**

If this Court elects to impose an adverse inference as a sanction, TMS would remain prejudiced by its inability to discover information that is relevant and necessary to its claims. Therefore, in addition to sanctioning the improper conduct, this Court's sanctions must also "level[] the evidentiary playing field." *Silvestri,* 271 F.3d at 590. Thus, TMS requests that the following actions be taken to cure the evidentiary prejudice caused by the spoliation of text messages: (1)

Bethany Ripani should be precluded from testifying in Defendants' case because TMS cannot verify or corroborate the veracity of her alleged involvement; and (2) Ripani should be precluded from entering any text messages as evidence in his case in chief.

## **CONCLUSION**

As the Amended Complaint alleges, Ripani's misappropriation and unfair competitive acts were "intentional, knowing, willful and malicious." Ripani's post-employment conduct reflects that same attitude—evidencing a deliberate and sustained effort to conceal the scope of his wrongdoing—from retaining the stolen laptop under false pretenses, to accessing TMS's systems in defiance of cease-and-desist demands, to destroying the text message evidence that would have revealed the full breadth of his unfair competitive acts. His actions must be deterred, and the prejudice to TMS must be remedied.

Dated: June 19, 2026

Respectfully submitted,

_____/s/_____
Jennifer L. Curry, Esq., Bar. No. 29038
jcurry@bakerdonelson.com
Zachary D. Erwin, Esq., Bar No. 29045
zerwin@bakerdonelson.com
Alexander V. Cranford, Esq., Bar No. 21281
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
100 Light Street, 19th Floor
Baltimore, Maryland 21202
Phone: (410) 862 – 1183
Fax: (410) 547 – 0699

*Attorneys for Transportation Management Services, Inc*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 19th day of June, 2026, the foregoing Memorandum of Law in Support of Plaintiff's Motion for Spoliation Sanctions Pursuant to Fed. R. of Civ. P. 37(e) was served via CM/ECF.

_____/s/_____

Alexander V. Cranford, Esq.
